**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| v. | § | Criminal Action No.: 4:24-cr-00298 |
| | § | |
| EITHAN DAVID HAIM | § | |

**GOVERNMENT'S PRETRIAL MOTIONS**

TO THE HONORABLE DAVID HITTNER:

The Government respectfully submits this memorandum of law in support of its pretrial motions with respect to the upcoming trial of defendant Eithan David Haim ("Haim," or "the defendant").[1] Specifically, the Government seeks rulings:

(1) Precluding the defendant from using the term "whistleblower" before the jury;

(2) Limiting testimony and argument regarding issues pertaining to transgender care;

(3) Precluding the defendant from presenting arguments or evidence regarding the Government's alleged motivation for prosecuting the defendant and alleged prosecutorial misconduct;

(4) Excluding testimony that the defendant is a good doctor;

(5) Precluding arguments or testimony about possible punishments or collateral consequences;

(6) Ordering the defendant to refrain from making derogatory remarks about prosecutors and law enforcement officers;

---

[1] The Government will respond separately to the defendant's motions for a bill of particulars and for a continuance of the trial.

1

(7) Precluding the defendant from offering his own out of court statements as evidence;

(8) Directing the defendant not to use witness interview reports to impeach;

(9) Precluding the defendant from raising an advice-of-counsel defense; and

(10) Ordering the defendant to produce reciprocal discovery, a witness lists, and witness statements.

<u>FACTUAL BACKGROUND</u>

The defendant, a doctor at a Texas hospital, violated a federal law established to protect the privacy of all patients' medical records.  He lied to gain access to the medical records of children who were not his patients with the intent to cause malicious harm to the hospital, its doctors, and patients.

From 2018 through 2023, the defendant was a resident doctor of Baylor College of Medicine ("Baylor"), a medical school and research center located in Houston, Texas.  He specialized in general surgery.  (Indictment ("Ind.") ¶¶ 1, 2).  In or around 2018, as part of his entry into Baylor's residency program, the defendant received extensive training in the requirements of the Health Insurance Portability and Accountability Act ("HIPAA"). (Ind. ¶ 8). HIPAA is a federal statute enacted in 1996 that, among other things, sets national standards to protect the privacy and confidentiality of all patients' health information and medical records from unauthorized disclosure.

As part of the defendant's HIPAA training, Baylor provided the defendant with important information about HIPAA, including the purpose of HIPAA, what information is HIPAA-protected, when a doctor can obtain patient records, the rights of patients, when and how HIPAA-protected information can be disclosed, and what information must be removed from a

2

medical record in order to properly "de-identify" that record under HIPAA.

In addition to learning about HIPAA, the defendant attended trainings in which he was taught how to properly report concerns. Specifically, the defendant attended trainings in which Baylor provided information about how to anonymously report any suspected instances of illegal conduct or ethical violations. The training was relevant not only to Baylor, but to the related hospitals and health care providers where the defendant would spend his rotations. (Ind. ¶ 8).

As part of the defendant's residency with Baylor, he had five rotations from 2019 to 2021 in the general surgery division at Texas Children's Hospital ("TCH"). (Ind. ¶ 4). TCH is one of the largest children's hospitals in the United States, located in the Southern District of Texas. (Ind. ¶ 3). TCH treats pediatric patients residing in Houston, Texas and elsewhere. TCH also offers treatment for adults seeking certain areas of care, such as obstetrics, gynecology, and fetal intervention. TCH patients provided TCH with their personal identification and health information, including their name, date of birth, social security number, medical history, prescriptions received, and medications taken. TCH uses computers and computer systems to store and exchange this patient information electronically. (Ind. ¶ 5). TCH is a "covered entity," as described in HIPAA, 42 U.S.C. § 1320-9(b)(3). The patient records maintained on TCH computers and computer systems contained "individually identifiable health information," as defined in HIPAA, 42 U.S.C. § 1320d(6) and 45 C.F.R. § 160.103. (Ind. ¶ 6).

As part of his rotations at TCH, the defendant received computer login credentials from TCH in order to access patient medical files. Under HIPAA and Baylor policy, the defendant was only authorized to access and use protected health information that was the minimum necessary to treat patients. *See* 45 C.F.R. § 164.502(b). The defendant was not authorized to look

at medical records for patients that were not under his care at Baylor, TCH or any other relevant entities. (Ind. ¶ 7).

The defendant's last rotation with TCH was from December 2020 to January 2021. After January 2021, the defendant had no patients under his care at TCH—either children or adults. (Ind. ¶ 9).[2] As a result, the defendant's TCH login credentials lapsed due to inactivity. (Ind. ¶ 10).

From September 2022 through April 2023, despite the fact that he had no patients at TCH, the defendant attempted to re-activate his TCH login credentials on numerous occasions. (Ind. ¶ 10). In January 2023, for example, the defendant emailed an administrator at TCH requesting remote access to the system because he needed it for "ACS" (adult care services) patient information. On April 19, 2023, the defendant emailed an administrator at TCH urgently requesting that his login credentials be restored so he could access "operative cases" he was "covering." This was a lie. In fact, the defendant wanted to be able to access the medical files of children not under his care.  (Ind. ¶ 11).  The defendant did not treat or access the files of any adult care patients during this time period at TCH. (Ind. ¶ 12).

After successfully renewing his login credentials, the defendant then accessed records for children not under his care.  As described in greater detail below, in April and May 2023, the defendant obtained confidential patient information including patient names, treatment codes, dates of service, and attending physician names from TCH's electronic system, EPIC, without

---

[2] During the relevant timeframe, the defendant was on a list of physicians available for adult patients at TCH's Women's Pavilion in case of emergencies like natural disasters. However, TCH witnesses will testify that this backup list was very rarely used. And the defendant did not actually treat any adult patients at TCH in 2022 and 2023.

4

authorization and under the false pretense that he needed to urgently attend to adult care services. (Ind. ¶ 15).

Specifically, on April 21 and 24, 2023, the defendant went in person to TCH, despite the fact that he had no patients there and was not on rotation at TCH. According to video surveillance and TCH records, on April 21 and 24, 2023, the defendant used his badge to enter secure access areas at TCH which housed computer terminals. On April 21, 2023, he logged into TCH's EPIC system, but did not access any patient records.  On April 24, 2023, during two separate EPIC logins, he accessed and obtained the medical files of children that were not under his care, in particular, patients L.M., A.C., and A.S. (Ind. ¶ 13, p. 4 (Count One)).  These patients were pediatric transplant patients who were not receiving care for gender dysphoria.

On April 26, 2023, the defendant emailed TCH requesting remote access to TCH's computer system so he could covertly access the medical files of children that were not under his care from offsite, rather than in person at TCH, where his unauthorized search would be more visible to other physicians. (Ind. ¶ 14). On May 9, 2023, the defendant received remote access. That day, May 9, 2023, he used remote access to obtain the confidential patient information of patient G.M., (*See* Ind. p. 4 (Count One)), who, like the earlier patients, was a pediatric transplant patient, not a gender dysphoria patient.

From May 9, 2023 through May 14, 2023, the defendant logged into TCH's electronic system remotely on multiple occasions.  During that time period he reviewed and obtained pediatric surgical schedules for TCH patients, which contained individually identifying health information, including the information of pediatric patients M.S., K.B., and G.H. (*See* Ind. p. 5 (Counts Two-Four)). Not all of the children whose medical records the defendant accessed were

receiving care for gender dysphoria.  In order to find those records, the defendant had to review the records of other children, too. None of the children were patients of the defendant.

The defendant never attempted to report or actually reported any concerns to his supervisors at Baylor or TCH.  Nor did he report his concerns to the anonymous hotline provided by Baylor or Child Protective Services. (Ind. ¶ 16).  Instead, the defendant decided to leak the private medical records of children—without those patients' knowledge or authorization—to the media.

After obtaining the surgical schedules containing individually identifying health information of TCH pediatric patients (the "HIPAA-Protected Information"), Haim then disclosed that information to Person1, a media contact, intending to cause malicious harm to TCH, its doctors, and its patients. (Ind. ¶ 17).  Between May 14 and May 16, 2023, the defendant and Person1 talked on the phone numerous times.  Then, on May 16, 2023, Person1 published the HIPAA-Protected Information obtained by the defendant on X (formerly known as Twitter) and other online media outlets. Although the HIPAA-Protected Information published on X had redacted out the names of pediatric patients, other individually identifying health information remained publicly visible, including the dates of service, diagnosis, procedure codes, and physician names. (TCH ¶ 18).

The defendant's actions resulted in TCH suffering financial loss, medical delays in previously scheduled patients, as well as threats and harm to its doctors and patients.  (TCH ¶ 19).

<u>PROCEDURAL HISTORY</u>

A.      Indictment

On May 29, 2024, a grand jury in the Southern District of Texas indicted the defendant with four counts of violating the criminal provisions of HIPAA.

Count One charges that from on or about September 2022 through on or about February 2024, the defendant knowingly and without authorization obtained individually identifiable health information under false pretenses, specifically, electronic medical record maintained by TCH containing the individually identifiable health information of approximately four TCH patients, L.M., A.C., A.S., and G.M., in violation of 42 U.S.C. §§ 1320d-6(a)(2) and (b)(2).  As described above, Count One comprises the defendant's conduct with regard to the pediatric transplant patients whose files he obtained under false pretenses.  The proof at trial will show that the defendant obtained the individually identifiable health information for these patients on April 24, 2023 and May 9, 2023.

Counts Two through Four charge that between on or about April 24, 2023 and May 14, 2023, the defendant knowingly and without authorization obtained and/or wrongfully disclosed the individually identifying information of three patients, M.S., K.B., and G.H., with intent to cause malicious harm to TCH and its physicians, in violation of 42 U.S.C. §§ 1320d-6(a)(2) and (b)(3).  As described above, Counts Two through Four relate to patients whose information the defendant obtained and then leaked to Person1. The proof at trial will show that the defendant obtained the individually identifiable information for these patients between May 9, 2023 and May 14, 2023.

B.   Discovery

On June 17, 2024 and July 1, 2024, the Government produced Rule 16 discovery to the defendant.  The discovery in the case includes, among other things, Baylor and TCH training materials; HIPAA certifications and test results; TCH's electronic system (EPIC) access records; emails; video surveillance; hospital assignment and rotation schedules; call detail records and a phone audio recording.  The Government has also produced reports of interviews with witnesses.

The defendant has made numerous media statements and appearances regarding the case and other topics. The defendant has not made any statements to the Government. The Government does not have knowledge or possession of all the statements made by the defendant to the media or other outlets.

<u>DEFENDANT'S STATEMENTS TO THE MEDIA</u>

Before and after the Indictment, the defendant and his attorney gave multiple interviews on television, podcasts, and other media forums, in which the defendant admitted to leaking the TCH patient information to Person1.[3] During these interviews, the defendant and/or his counsel made statements:

- Describing the defendant as a whistleblower, or someone who has "blown the whistle;"

- Claiming that the Government's motivations for prosecuting the defendant were

_____

[3] *See, e.g.*, "Texas Children's Hospital Whistleblower Comes Forward," (Jan. 10, 2024) *available at* https://www.youtube.com/watch?v=FrZDSy6SG4c; "Dr. Eithan Haim Exposed Texas Children's Hospital for Secret Transgender Program," (Jan. 12, 2024) *available at* https://www.youtube.com/watch?v=gJdOtjP66KM; Surgeon facing charges after transgender care allegations against Texas hospital," (June 11, 2024), *available at* https://www.foxnews.com/video/6354813619112; "Courageous Truth: Meeting Dr. Eithan Haim," (July 24, 2024) *available at* https://www.youtube.com/watch?v=0OJBj9OvzYc.

8

political and ideological;

- Claiming that the intention of the Government in taking certain investigative steps and in prosecuting the defendant were to intimidate and/or extort the defendant and to silence whistleblowers;

- Personally disparaging AUSA Tina Ansari, including, for example, by calling her "despicable," claiming she "should be ashamed of herself," and has a "poor grasp on her own profession;"[4]

- Providing inaccurate and inflammatory descriptions of the medical care previously provided by TCH for pediatric patients with gender dysphoria, for example, as "mutilation," and "sterilization;"

- Providing lengthy descriptions and explanations of medical interventions for pediatric patients with gender dysphoria and the medical, social, political, and moral outcomes/ramifications of those treatments.

<u>HIPAA</u>

HIPAA provides criminal penalties for the wrongful obtaining or disclosure of individually identifiable health information ("IIHI").  Pursuant to 42 U.S.C. § 1320d-6(a),

A person who knowingly and in violation of this part . . .

(2) obtains individually identifiable health information relating to an individual; or
(3) discloses individually identifiable health information to another person,
shall be punished as provided in subsection (b). For purposes of the previous
sentence, a person (including an employee or other individual) shall be considered

---

[4] "TX Whistleblower Slams Alleged Misconduct of Prosecutor Ansari," *The Dallas Express* (Jan. 27, 2024) *available at* https://dallasexpress.com/state/tx-whistleblower-slams-conduct-of-prosecutor-ansari/.

to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) [5] and the individual obtained or disclosed such information without authorization.

As relevant here, HIPAA sets forth different penalties "if the offense is committed under false pretenses," 42 U.S.C. § 1320d-6(b)(2), or "if the offense is committed with intent to sell, transfer, or use individually identifiable health information for . . . malicious harm," *id.* § 1320d-6(b)(3).

HIPAA's privacy regulation defines "individually identifiable health information" as:

information that is a subset of health information, including demographic information collected from an individual, and:
  (1) Is created by a health care provider, health plan, employer, or health clearinghouse; and
  (2) Relates to the past, present, or future physical or mental health or condition of an individual; or the past, present, or future payment for the provision of health care to an individual; and
  (i) That identifies the individual; or
  (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

45 C.F.R. § 160.103.

HIPAA requires that any "covered entity" under the Act obtain authorization before using or disclosing a patient's IIHI, 45 C.F.R. §§ 160.103, 164.508, unless certain exceptions apply, 42 C.F.R. § 164.512. The regulations also set forth requirements for proper "de-identification of

---

[5]  HIPAA's privacy regulation defines a "covered entity" as "[a] health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchaper." 45 C.F.R. § 160.103. A "transaction" means the "transmission of information between two parties to carry out financial or administrative activities related to health care." *Id.*

protected health information,"[6] 45 C.F.R. § 164.514, which includes the removal of, *inter alia*, names and dates "directly related to an individual," including admission date, *id.* § 164.514(b)(2)(i).

HIPAA regulations include a whistleblower provision that allows disclosure of HIPAA-protected information under certain specific circumstances:

> (j) *Standard: Disclosures by whistleblowers and workforce member crime victims*.
> (1) *Disclosures by whistleblowers*. A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce or a business associate discloses protected health information, provided that:
> (i) The workforce member or business associate believes in good faith that the covered entity has engaged in conduct that is unlawful or otherwise violates professional or clinical standards, or that the care, services, or conditions provided by the covered entity potentially endangers one or more patients . . . .; and
> (ii) The disclosure is to:
> (A) A health oversight agency or public health authority authorized by law to investigate or otherwise oversee the relevant conduct or conditions of the covered entity or to an appropriate health care accreditation organization for the purpose of reporting the allegation of failure to meeting professional standards or misconduct by the covered entity; or
> (B) An attorney retained by or on behalf of the workforce member or business associate for the purpose of determining the legal options of the workforce member or business associate with regard to the conduct described in paragraph (j)(1)(i) of this section.

45 C.F.R. § 164.502(j).

Under the plain language of the statute, a defendant can be convicted of violating HIPAA if he obtains *or* discloses IIHI without authorization. *See* 42 U.S.C. § 1320d-6(a)(2) and (3). Thus, "HIPAA does not simply prohibit public disclosure of protected information," *Rutherford v. Palo Verde Health Care District*, No. 13-1247, 2014 WL 12632901, at *12 (C.D. Cal. Apr.

---

[6] The HIPAA regulations define "protected health information" as "individually identifiable health information" transmitted or maintained by or in electronic media or other form. 45 C.F.R. § 160.103.

17, 2014) (citing 45 C.F.R. § 164.402 ("Breach means the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information.")), it also prohibits the unauthorized obtaining of that information even if it is not disclosed. *See United States v. Zhou*, 678 F.3d 1110, 1112-13 (9th Cir. 2012) (affirming HIPAA conviction of former employee who accessed patient records in days after employment terminated).

<u>ARGUMENTS</u>

I.      The Defendant Should Be Precluded from Using the Term "Whistleblower" Before the Jury

In various media outlets, the defendant and his counsel have described the defendant as a "whistleblower," or someone who "blew the whistle" on what he perceived to be a problematic practice at TCH.  The Court should prohibit the defense from using that terminology before the jury in testimony or arguments because it risks confusing and misleading the jury and unduly prejudicing the Government.

A.      Legal Standards

1.      Rules of Evidence

Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevancy "exists only as a relation between an item of evidence and a matter properly provable in the case." *Id.,* Advisory Committee's Note. If the evidence does not possess "sufficient probative value to justify [a Court] receiving it in evidence," *id.*, it is not relevant and hence, it is inadmissible. Fed. R. Evid. 402.

Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury[.]" Fed. R. Evid. 403. Evidence is unfairly prejudicial if it possesses "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Committee-e's Note. A district court has broad discretion to exclude evidence under Rule 403. *See United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996).

> 2.     Laws Covering Whistleblowers

According to Black's Law Dictionary, a whistleblower is "[a]n employee who reports employer wrongdoing to a governmental or law-enforcement agency." Black's Law Dictionary (12th ed. 2024).  Multiple federal and state laws protect whistleblowers from employer retaliation for exposing wrongdoing—but typically only if the individual making the disclosure does so through proper, prescribed channels. *See, e.g.*, 18 U.S.C. § 1514A (Sarbanes-Oxley Act prevents retaliation against employees of publicly held companies who make disclosure to government agency, law enforcement agency, congress, or a supervisor); 31 U.S.C. 5323(a)(5) (same for individuals reporting violations of the Anti-Money Laundering Act); Tex. Gov't Code Ann. § 554.002 (Texas Whistleblower Act prevents retaliation against public employees who disclose wrongdoing to "an appropriate law enforcement authority"); Tex. Health & Safety § 161.134(a) (prevents retaliation by a hospital against an employee for reporting a violation of law to the employee's supervisor, administrator, state regulatory agency, or law enforcement); *cf.* 5 U.S.C. 5323(a)(5) (Whistleblower Protection Act prohibits retaliation against federal employees for disclosure of wrongdoing, including to the public, but only if "such disclosure is

not specifically prohibited by law. . . ."); Congressional Research Services, "Compilation of Federal Whistleblower Protection Statutes" (Apr. 25, 2024), *available at* *https://crsreports.congress.gov/product/pdf/R/R46979*.

HIPAA has its own whistleblower provision meant to protect "covered entities" if their employees engage in whistleblowing activities. 45 C.F.R. § 164.502(j)(1)(ii)(A) and (B).  In line with other whistleblower statutes, the regulations set forth that a health care provider has not violated HIPAA *only* if the disclosure of protected information is made to (A) "[a] health oversight agency or public health authority authorized by law to investigate or otherwise oversee the relevant conduct or conditions of the covered entity or to an appropriate health care accreditation organization for the purpose of reporting the allegation of failure to meet professional standards or misconduct by the covered entity," or (B) an attorney retained on behalf of the health care provider "for the purpose of determining the [provider's] legal options[.]" 45 C.F.R. § 164.502(j)(1)(ii)(A) and (B).

B.    Argument

Simply put, the defendant is not a whistleblower under HIPAA, the Texas Health & Safety Code, or any other law.  Haim did not disclose the HIPAA-protected patient information to a health oversight agency, public health authority, or appropriate health care accreditation organization. He and his counsel have never suggested—to the Government or during his various media appearances—that he first disclosed the information to a lawyer, who advised him (misguidedly) to go to the press. He did not even try to report his concerns about treatment of patients with gender dysphoria to his supervisors, the anonymous hotline provided by Baylor, Child Protective Services, or some other governmental entity that could properly investigate.

14

Instead, the defendant disclosed the protected information to a member of the media for public dissemination.  This does not make him a whistleblower—it makes him a leaker of protected information. *See, e.g.*, *Tides v. The Boeing Co.*, 644 F.3d 809, 816 (9th Cir. 2011) (holding that Sarbanes-Oxley's whistleblower provision does not protect employees from retaliation when they disclose information about fraud or securities violations to members of the media); *City of Beaumont v. Boullion*, 896 S.W.2d 143, 145 (Tex. 1995) (holding that disclosure to the media is "clearly not an appropriate 'law enforcement authority' under the [Texas] Whistleblower Act.").

Arguments, testimony, or other evidence that the defendant is a whistleblower or "blew the whistle" are irrelevant to the facts at issue.  *See* Fed. R. Evid. 401.  In any event, the probative value of using that descriptor—which is zero since it is not accurate as applied to the defendant—is substantially outweighed by the risk of confusing the issues, misleading the jury, and unfair prejudice to the Government.  *See* Fed. R. Evid. 403; *cf., United States v. Dimora*, 843 F. Supp. 2d 799, 848 (N.D. Ohio 2012) (granting defendant's motion to preclude Government attorneys from referring to the defendant as the "godfather" because the term "has the very real potential of being improperly transformed to invoke negative and sinister connotations and to convey strong prejudicial overtones" (internal citations and quotation marks omitted) (citing cases).  The term whistleblower—especially when used in a courtroom, before a jury— inaccurately suggests that the defendant had a right or obligation to obtain and disclose HIPAA-protected information, or that he was protected under the law in doing so.  For the reasons set forth above, that is not the case. The Court should therefore preclude the defendant from arguing or offering testimony that the defendant was a "whistleblower."

15

II.     **The Court Should Limit Testimony and Arguments Regarding Transgender Care for Children**

The Government anticipates that the defense will try to distract and confuse the jury by making the trial about a polarizing and inflammatory issue: medical interventions for minors with gender dysphoria, also referred to as transgender care, or gender-affirming care. This hot-button political issue is unrelated to the central factual question of the case, which is whether the defendant obtained and then disclosed HIPAA-protected medical records without authorization. The Court should therefore limit the admission of irrelevant evidence, testimony, cross-examination, and arguments on this topic to avoid a trial within a trial on an extraneous issue. *See* Fed. R. Evid. 401, 402, 403.

The trial will likely include some permissible testimony regarding transgender care and TCH's prior practices in this area. For example, TCH employee(s) may testify for the Government regarding, as background and on a high level, what surgical services TCH offered for minors with gender dysphoria; and the nature of the medical records the defendant obtained and disclosed. Based on the defendant's media appearances, it seems likely that defense witnesses will testify that the defendant's intent in disclosing the medical records was to expose TCH's medical services for transgender minors.

To be clear, the Government does not dispute the defendant's ability to offer relevant testimony that goes directly to the issue of mens rea. But the defense should not be permitted to turn the case into a referendum on transgender care by offering irrelevant testimony from witnesses who have no first-hand knowledge about the facts actually at issue in the case. The factual issues in the case are simple and straightforward: did the defendant obtain and/or disclose medical records without authorization? And did he do so under false pretenses, and/or with intent

to use that information for malicious harm? The case is *not* about the merits of TCH's practices or public statements; and it is *not* about what transgender care for minors entails, what the short or long-term outcomes for such patients may be, or whether puberty blockers or other medical services for these patients are helpful, harmful, medically indicated, or morally or politically correct.

While reasonable people can disagree about transgender medical care for minors, this case is not the appropriate venue for such a debate. Analogous arguments about broader public policies have been excluded in other cases. *See, e.g.*, *United States v. Chugay*, No. 21-10008-CR, 2022 WL 1782583, at *3 (S.D. Fla. June 1, 2022) (precluding defendant in an immigration case from arguing that United States' immigration policies are unjust); *United States v. $114,700.00 in United States Currency*, No. 17-cv-452, 2019 WL 6130804, *3 (D. Colo. Nov. 19, 2019) (granting motion in limine to exclude testimony or argument regarding marijuana policy in a drug case and pointing out that "it is improper to present legal arguments—or policy arguments about what the law ought to be—to the jury").

The Government therefore respectfully requests that the Court preclude evidence and arguments regarding transgender medical care that are irrelevant to the defendant's guilt or innocence. *See* Fed. R. Evid. 401, 402. The admission of irrelevant and inflammatory evidence is an invitation to jury nullification, and properly excluded. *See United States v. Thompson*, 253 F.2d 700, 2001 WL 9498430, at *16 (5th Cir. Apr. 9, 2001) ("Jury nullification is not a 'right' belonging to the defendant." (quoting *United States v. Gonzalez,* 110 F.3d 936, 947-48 (2d Cir. 1997))). "A trial judge may block defense attorneys' attempts to serenade a jury with the siren song of nullification." *Id.* (citations, internal quotation marks and alterations omitted)); *see also United*

17

*States v. Funches*, 135 F.3d 1405, 1408-09 (11th Cir. 1998) (citing cases)).

Furthermore, even if such evidence were relevant—and, for the reasons set forth above, it is not—any probative value is substantially outweighed by the danger of unfair prejudice to the Government, confusion of the issues, misleading the jury, undue delay, and wasting time. Fed R. Evid. 403; *see Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (internal citation and quotation marks omitted)); *United States v. Diaz,* 637 F.3d 592, 597 (5th Cir. 2011) (stating that a district court has discretion "to place reasonable limits on a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant" (internal quotation marks and citation omitted)); *cf. United States v. Andreas*, 23 F. Supp. 2d 835 (N.D. Ill. 1999) (precluding defense from introducing evidence or arguments regarding race and national origin).

It is easy to imagine how testimony on transgender care for children could devolve into a back-and-forth battle of witnesses on topics that have little or nothing to do with the facts at issue.   The Court should strictly limit the admissibility of testimony or argument on these inflammatory topics.

III.    The Court Should Preclude Evidence or Argument About the Government's Alleged Motives for Prosecution or Prosecutorial Misconduct

In media interviews and statements, the defendant and his counsel have claimed that the defendant is being prosecuted for political reasons, as retaliation for his coming forward on issues related to transgender care, and to intimidate him and other doctors from speaking out.   These claims are as false as they are offensive.   In any event, the Government's motives for prosecution

are irrelevant to the question of the defendant's factual guilt that will be before the jury at trial, and any probative value of such evidence is substantially outweighed by the danger of unfair prejudice to the Government and risk of distracting the jury or encouraging jury nullification.  Fed R. Evid. 401, 403.  The Court should therefore preclude evidence or argument regarding the Government's supposed motives for prosecution.

"Courts have consistently excluded evidence and argument by defendants seeking to attack the prosecution's motives in initiating prosecution." *United States v. Cleveland*, 1997 WL 253124 (E.D. La. May 14, 1997) (citing cases); *see, e.g.*, *United States v. Katz,* No. 92-CR-94, 1992 WL 137174 at *7 (N.D. Ill. 1992) (granting government's motion to preclude inquiry regarding "[t]he subjective intentions or motivations of the agents involved in this case."). Arguments that the Government has targeted the defendant for political reasons are, essentially, claims of selective prosecution, which must be raised before trial. Fed. R. Crim P. 12(b)(3)(iv) (claims of selective or vindictive prosecution must be raised before trial).[7] These claims are not "defense[s] on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996); *United States v. Miller*, 799 F.2d 985, 988 (5th Cir. 1986); *United States v. Graves*, 556 F.2d 1319, 1321-22 (5th Cir. 1977); *United States v. Swiatek,* 819 F.2d 721, 726 (7th Cir. 1987) (noting that every circuit which has considered the issue has held that the issue of government misconduct is not a jury question) (citations omitted); *United States v. Schmidt*, 935 F.2d 1440, 1449-50 (4th Cir. 1991) (upholding refusal to give a requested

---

[7] A claim of selective prosecution requires the defendant to show that the federal prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose.  *United States v. Jones,* 287 F.3d 325, 333 (5th Cir. 2002).

instruction on selective prosecution); *United States v. Johnson,* 605 F.2d 1025, 1030 (7th Cir.

1979) (affirming the exclusion of evidence offered to show that the "indictment was a political

instrument"); *United States v. Berrigan,* 482 F.2d 171, 174-76 (3d Cir. 1973) (affirming exclusion

of evidence relating to "discriminatory prosecution"); *United States v. Crinel*, No. 15-61, 2016

WL 6441249 (E.D. La. Nov. 1, 2016) ("Charges of selective prosecution are matters for the court

and should not be mentioned in the presence of the jury." (internal citation omitted)); *United

States v. Lopez,* 854 F. Supp. 57, 60 (D. Puerto Rico 1994) (finding evidence of selective

prosecution "has no bearing whatsoever on whether the defendant committed the crimes alleged,

and will not be allowed at trial"); *United States v. Napper,* 553 F. Supp. 231, 232 (E.D.N.Y.

1982) (stating that defendant could not argue at trial that her prosecution was selectively brought).

 For these reasons, and because the risk of unfair prejudice to the Government

substantially outweighs any probative value, Fed. R. Evid. 403, the Court should preclude the

defendant from making claims of political persecution or prosecutorial misconduct during trial.

 IV. Testimony That the Defendant is a Good Doctor Is Impermissible Character Evidence
  that Should Be Excluded

 The Defendant should not be allowed to introduce evidence regarding whether the

defendant was a good doctor who helped and cared for his patients. Such evidence is

impermissible character evidence, irrelevant, and risks confusing the jury by appealing to

emotion.

 A.  Legal Standard

 "Evidence of a person's character or character trait is not admissible to prove that on a

particular occasion the person acted in accordance with the character or trait." Fed. R. Evid.

404(a)(1).  In the case of a criminal defendant, there are exceptions to that rule. In particular, "a

defendant may offer evidence of the defendant's pertinent trait[.]" Fed. R. Evid. 404(a)(2)(A).

"When evidence of a person's character or character trait is admissible, it may be proved by

testimony about the person's reputation or testimony in the form of an opinion." Fed. R. Evid.

405(a).  *See United States v. Davenport*, 449 F.2d 696, 699 (5th Cir. 1971) ("The only type of

evidence admissible to show defendant's character is proof of his reputation in the

community."); *United States v. Romero*, 339 F. App'x 470, 472 (5th Cir. 2009) (on direct

examination, the witness was permitted to testify only generally as to the defendant's

"reputation" in the community as a "law-abiding person"). Only on cross-examination of a

character witness may the court allow inquiry into specific instances of conduct. *Id.*

Whether a particular character trait is "pertinent," Fed. R. Evid. 404(a)(2)(A), and

therefore admissible, depends on the charges in the case. "In the criminal context, a pertinent

trait is one that is relevant to the offense charged."  *United States v. John*, 309 F.3d 298, 303 (5th

Cir. 2002); *see United States v. Hewitt*, 634 F.2d 277, 279 (5th Cir. 1981); *United States v.

Davis*, No. 20-30438, 2022 WL  22600, at *2 (5th Cir. Jan. 24, 2022) (affirming denial of

defendant's request to introduce evidence of a victim's character where the trait was not

"relevant to the offense and thus a pertinent character trait").

Evidence regarding a defendant's non-criminal behavior or good deeds is generally not

relevant at trial.  *See, e.g.*, *United States v. Harris,* 491 F.3d 440, 447 (D.C. Cir. 2007)

(describing as "unassailable" a district court's ruling excluding evidence of the defendant's

character as a "dedicated family man" in drug case because "it is familiar ground that while a

criminal defendant can put character in issue, the evidence can concern only a 'pertinent trait of

character'"); *United States v. Neighbors*, 23 F.3d 306 (10th Cir. 1994) (pharmacist indicted for

illegally dispensing narcotics was not permitted to introduce character testimony regarding his service on the board of a substance abuse center, as it was not material to the charges); *United States v. Santana-Camacho*, 931 F.2d 966 (1st Cir. 1991) (testimony of defendant's daughter purportedly showing that defendant was a good "family man" was not admissible character evidence in as much as traits of character were not pertinent to the crime of smuggling illegal aliens); *United States v. Camejo*, 929 F.2d 610 (11th Cir. 1991) (evidence that portrayed defendant as a good person through the use of prior "good acts" was inadmissible character evidence in narcotics prosecution); *United States v. Jackson*, 588 F.2d 1046, 1055 (5th Cir. 1979) (since evidence of trait of truthfulness is not pertinent to the criminal charges of conspiracy to distribute heroin, introduction of such evidence is forbidden as circumstantial evidence of those crimes).

B.  Argument

This case is not about whether the defendant is a good or bad doctor or a good or bad person. It is about whether he obtained and/or disclosed patients' medical files without authorization with the requisite intent. The defendant's skills as a doctor are not pertinent to the charges in the case.  *See John*, 309 F.3d at 303. The Court should therefore preclude the defendant from eliciting testimony from witnesses, such as patients, co-workers, or supervisors, regarding whether he is a good doctor or the help that they received from him.  Such testimony in the form of either reputation or opinion evidence or specific instances is inadmissible, since it is not pertinent to the case. Fed. R. 404(a)(2)(A), 405. Nor should the Court permit the defendant to smuggle such evidence into the case through the argument that it is relevant to his lack of motive or intent. "Such a tactic is not only disfavored, it is not permitted under Rule 405(b)."  *United*

22

*States v. Marrero*, 904 F.2d 251, 259 (5th Cir. 1990).

Even if evidence of the defendant's good conduct is deemed relevant, it should be excluded under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. A jury may be emotionally swayed to acquit the defendant on the charges not because he is innocent, but because they heard testimony about how he is supposedly a good or helpful doctor. For that reason, such testimony is highly prejudicial and confusing, and the defendant should not be permitted to offer it.

V.    The Court Should Preclude References to Punishment and Collateral Consequences

Evidence and argument regarding possible punishment for the offenses with which the defendant is charged and other collateral consequences the defendant may face if convicted are irrelevant and inflammatory, *see* Fed. R. Crim. P. 401, 403. The Court should therefore preclude the defendant from mentioning these topics before the jury.

The Supreme Court has stated that jurors should be instructed not to consider a defendant's potential sentence during deliberations. *Shannon v. United States,* 512 U.S. 573, 579 (1994). This is in accord with the Fifth Circuit Pattern Jury Instructions, which instructs jurors not to consider punishment in any way. Fifth Circuit Pattern Jury Instructions 1.20 (2001). In fact, "[i]t is error to tell the jury about the consequences of a certain verdict even if they are mandatory." *United States v. McCracken,* 488 F.2d 406, 424 (5th Cir. 1974); *United States v. Richardson,* 130 F.3d 765, 778 (7th Cir. 1997) (noting that "arguing punishment to a jury is taboo"); *United States v. Frank,* 956 F.2d 872, 879 (9th Cir. 1991) ("It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict."); *United States v. Greer,* 620 F.2d 1383, 1384 (10th Cir. 1980). It is therefore well-

settled that issues relating to sentencing and punishment should not be raised before the jury. Indeed, citing this principle, courts in this district (and elsewhere) have held that "[i]t is inappropriate . . . for either party to make arguments concerning what sentence might be imposed." *Cleveland*, 1997 WL 253124, at *3; *United States v. Aucoin*, No. 89-0541, 1990 WL 86452, at *1 (E.D. La. June 19, 1990) (granting unopposed motion *in limine* to preclude references to possible sentences and stating "[t]he Court agrees that matters of punishment and sentencing are not issues for the jury to consider"); *see also United States v. Williams*, No. 03-221, 2006 WL 2850063, at *3 (S.D. Tex. Oct. 3, 2006) (granting unopposed motion *in limine* to preclude references to potential punishments).

For the same reasons, the Court should preclude the defendant from raising before the jury other possible collateral consequences that may flow from conviction, such as the potential loss of the defendant's medical license, negative impacts on his employment prospects, and impacts on his family. *See, e.g*, *United States v. Andreas*, 23 F. Supp.2d 835, 852 (N.D. Ill. 1998) ("Impassioned pleas expounding upon the defendants' virtues as employers and how potential convictions would affect their families are irrelevant in determining their guilt or innocence and the court will not permit them to raise such arguments."); *United States v. Battaglia*, No. S9 05 Cr. 774, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"). The only reason to raise any of these potential consequences would be an impermissible attempt to garner the jury's sympathy.

VI.    The Court Should Preclude the Defense from Making Derogatory Statements about the Prosecutors and Law Enforcement Agents

In public statements, the defendant has attacked the integrity, character, and professional

24

fitness of one of the prosecutors. Such attacks have no place in the courtroom, let alone in front of the jury.

The Supreme Court has forbidden inflammatory and unfounded attacks on the prosecution. *United States v. Young*, 470 U.S. 1, 8-9 (1985). In the *Young* case, the defense counsel argued before the jury that the prosecutors had presented the case unfairly, made statements to poison jurors' minds, and deliberately withheld exculpatory evidence. Counsel also charged the prosecution with "reprehensible" conduct in purportedly attempting to cast a false light on respondent's activities, intimated that prosecutors did not believe in their case or act with integrity and honor, and argued that "[t]hese complex regulations should not have any place in an effort to put someone away." *Id.* at 4-5. The Supreme Court found these comments to be a breach of ethical standards, *id.* at 17-18, and cautioned against *ad hominem* attacks on prosecutors before the jury. *Id.* at 8-9.  *See also Mayes v. Kollman*, 560 F. App'x 389, 394-95 (5th Cir. 2014) (citing *Young*, 470 U.S. at  8-9).

The Government respectfully requests that the Court direct the defendant and his counsel to refrain from making derogatory and unfounded comments about the prosecutors or law enforcement agents during testimony or argument before the jury.

VII.    Defendant Cannot Offer His Own Out of Court Statements

The defendant has made self-serving statements in the media about his reasons and justifications for leaking patient medical records.  The Government respectfully requests an order precluding the defendant from introducing any of his own out-of-court statements to prove the truth of the matters asserted, because such statements would be inadmissible hearsay. *See* Fed. R. Evid. 801(c), 801(d)(2) (opposing party's statement admissible as non-hearsay if offered by a

party-opponent); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). The defendant may not introduce such hearsay statements because doing so would allow him to introduce his own self-serving statements without being subject to cross-examination.

Moreover, the rule of completeness, as codified in Federal Rule of Evidence 106, does not permit the defendant to introduce self-serving hearsay simply because the Government has introduced other statements of the defendant. Rule 106 applies only to written or recorded statements, and only when "fairness" dictates that another portion of that writing or recording "ought to be considered at the same time." Fed. R. Evid. 106. Even then, however, "Rule 106 does not compel admission of otherwise inadmissible hearsay evidence." *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (quotation omitted). Furthermore, it is within the Court's discretion to "redact portions of a written statement containing inadmissible hearsay while admitting portions of the statement that are admissible." *United States v. Angleton*, 269 F. Supp. 2d 878, 885 (S.D. Tex. 2003). Therefore the rule of completeness does not compel admission of the defendant's self-serving hearsay statements because other portions of the same recording may be admissible by the Government.

VIII.   Prior Witness Statements Not Impeachment Material

The Government moves the Court for an order directing defense counsel not to use the interview reports prepared by law enforcement to impeach government witnesses.

An interview report has no impeachment value unless it has been adopted by the witness or it reflects a substantially verbatim transcription. *See United States v. Miller*, 68 F.3d 465, 1995

26

WL 581492, at *4 (5th Cir. Aug. 23, 1995) ("[A]gent's interview notes are not 'statements' of the witness under § 3500(e) unless the witness 'signed or otherwise adopted or approved the report,' 18 U.S.C. § 3500(e)(1), or the notes were 'substantially verbatim reports' of the witness interview, 18 U.S.C. § 3500(e)(2)." (alteration in original) (quoting *United States v. Pierce*, 893 F.2d 669, 675 (5th Cir. 1990)). *See also Palermo v. United States*, 360 U.S. 343, 349-52 (1959) (finding it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations."); *United States v. Martinez*, 87 F.3d 731, 735-736 (5th Cir. 1996) (holding that a summary report of a witness interview prepared by the agent was not a "statement" of the witness); Fed. R. Evid. 613(b) (applies only to a prior inconsistent statement of the witness).

In this case, there are a number of interview reports that summarize interviews with government witnesses. None of these reports have been signed or adopted, and none are otherwise substantially verbatim recordings or transcripts of the interviews. Thus, these reports are not "statements" of the witnesses and cannot be used as impeachment material.

This Court should preclude the Defendants from using the interview reports in this case to impeach government witnesses at trial. Alternatively, the Government respectfully requests the Court to order that, before the Defendants can use a particular interview report as impeachment material, they seek and obtain an evidentiary ruling from the Court prior to proceeding. *See United States v. Judon*, 581 F.2d 553, 554 (5th Cir. 1978) (per curiam) ("Whether the [reports] contain sufficiently extensive verbatim recitation to bring the notes within the [Jencks] Act is a matter of fact to be decided by the trial court on the basis of conflicting testimony.").

27

IX.     The Court Should Preclude the Defendant from Raising an Advice of Counsel
        Defense

The Government respectfully requests that the Court preclude the defendant from
testifying, arguing, introducing evidence of, or raising as a defense that he was acting based on
the advice of an attorney.  Since HIPAA does not include willfulness as an element, advice of
counsel is not a defense to his commission of the crime, and suggestions or intimations that he
was acting based on legal advice are unfairly prejudicial.

In this Circuit, the advice of counsel defense may only be presented where willfulness is
an element of the offense. The Fifth Circuit has stated that "[r]eliance on counsel's advice
excuses a criminal act only to the extent it negates willfulness and to negate willfulness counsel's
advice must create (or perpetuate) an honest misunderstanding of one's legal duties." *United
States v. Mathes,* 151 F.3d 251, 255 (5th Cir.1998); *see also United States v. Moran,* 493 F.3d
1002, 1012 (9th Cir. 2007) (permitting testimony regarding legal advice received by defendant
where willfulness is an element of the offense). An honest misunderstanding of one's legal duties
negates the willfulness requirement because willfulness, as historically defined, means "that the
act was committed voluntarily and purposely, with the specific intent to do something the law
forbids; that is to say, with bad purpose either to disobey or disregard the law." 5th Cir. Pattern
Jury Instructions (Criminal) 1.38 (West 2001). Fifth Circuit case law similarly holds that
"willfulness simply means a voluntary, intentional violation of a known legal duty." *United
States v. Masat,* 948 F.2d 923, 932 (5th Cir.1991) (defining willfulness in a tax evasion case);
*see United States v. Charroux,* 3 F.3d 827, 831 (5th Cir.1993) (same).

In *United States v. Ragsdale,* 426 F.3d 765, 778 (5th Cir. 2005), the Fifth Circuit
affirmed the district court's refusal to allow the defendant to present an advice of counsel

defense where the alleged offense, mailing obscene materials, did not require "that the defendant have knowledge of the legal status of the materials." Instead, the defendant "need only know the character and nature of the materials," and therefore the crime was complete when the materials were deposited in the mail "by one who knew or had notice at the time of its contents ... 'although the defendant himself did not regard the [materials] as one that the statute forbade to be carried in the mails.'" *Id.* (*quoting Hamling v. United States,* 418 U.S. 87, 120 (1974)). Thus, the Fifth Circuit held that because the relevant statute "does not require an intent to violate the law, [the defendant] could not assert as a defense that he relied on advice from counsel that the materials were not illegal." *Ragsdale,* 426 F.3d at 778.

Under the plain language of the statute, HIPAA does not include willfulness as an element of the offense.  In other words, the Government need not show that the defendant committed the crime with the specific intent to do something the law forbids. Instead, the mens rea required is "knowingly," a lower standard that requires only that the defendant acted voluntarily and intentionally and not because of mistake or accident. *See United States v. Jobe*, 101 F.3d 1046, 1059 (5th Cir. 1996) (affirming jury instructions based on pattern instruction for "knowingly") (abrogated on other grounds).

Since reliance on advice of his counsel is not a defense available to the defendant, it would be highly prejudicial if the defendant suggested or intimated to the jury that he acted only after conversations with a lawyer. Fed. R. Evid. 403.  The Court should therefore preclude the defendant from any impermissible, backdoor attempt to insert the advice of counsel defense into proceedings.

X.      The Court Should Order the Defendant to Produce Reciprocal Discovery, A Witness List Prior to Trial, and Witness Statements

The Government respectfully requests that the Court order the defendant to comply with the reciprocal discovery provisions of Federal Rule of Criminal Procedure 16(b)(1)(A) and (B). As described above, the Government has already produced Rule 16 discovery to the defendant. The defendant should therefore permit the Government to inspect and copy or photograph any and all books, papers, documents, photographs, tangible objects, results or reports of physical or mental examinations made in connection with this case, or copies or portions thereof, within the possession or control of the defendant, and which the defendant introduce as evidence in chief at trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to his or her testimony.

In particular, the Government requests reciprocal discovery related to the following:

(1) Evidence that the defendant contacted, communicated, or attempted to contact or communicate regarding minors receiving or scheduled to receive transgender medical services with the following individuals or entities:

    i.   The defendant's supervisors at TCH or Baylor;

    ii.   TCH or Baylor;

    iii.   Child Protective Services;

    iv.   State, local, or federal law enforcement;

    v.   State, local, or federal government; and

(2) Text messages or other communications asking, instructing, or directing the defendant to access patient files or surgical schedules during the time period charged in the Indictment.

30

The Government also requests that the Court order the defendant to comply with Appendix C, Section J of the local rules of the United States District Court of the Southern District of Texas (as adopted April 27, 2000), and file with the Court prior to trial all witnesses the defendant anticipates may testify in his defense.

Finally, the Government also requests, pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure and the normal practice in the Southern District of Texas, that the defendant and his counsel produce for examination prior to trial any statements of witnesses that relate to the subject matter concerning which the witness will testify.  In the event such statements are produced during the trial and after the witness has testified, the Government requests that it be given time to examine such statements before beginning any cross-examination of the witness.

<u>CONCLUSION</u>

**WHEREFORE**, for the reasons outlined and described above, the Government respectfully requests that Court grant the Government's motions *in limine* and pretrial motions.


Date:   September 6, 2024                    Respectfully submitted,

                                            ALAMDAR HAMDANI
                                            United States Attorney, Southern District of Texas

                                            By:    *s/ Jessica Feinstein*_____
                                                   Tina Ansari
                                                   Tyler S. White
                                                   Jessica Feinstein
                                                   Assistant United States Attorneys
                                                   1000 Louisiana Street, 25th Floor
                                                   Houston, Texas 77002
                                                   Tel.: (713) 567-9000; FAX: (713) 718-3303
                                                   *Counsel for the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 6, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

/s/ <i>Jessica Feinstein</i>
Jessica Feinstein
Assistant United States Attorney
