## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § | **Criminal No. 24-CR-00298** |
| **V.** | § § § | |
| **EITHAN HAIM** | § § | |

## DEFENDANT'S RESPONSE TO GOVERNMENT'S PRETRIAL MOTIONS

Defendant, Dr. Eithan Haim, respectfully submits this memorandum of law in opposition to the government's Pretrial Motions (Motion), Dkt. No. 33.

The government seeks orders limiting Dr. Haim's defense in nine ways and an order requiring Dr. Haim to produce discovery and information. The government's Motion largely seeks to pre-try the case by precluding Dr. Haim from making common arguments in his defense. The relief it seeks is also without legal basis and in any event premature. Accordingly, the Court should deny the Motion in full.

## FACTUAL BACKGROUND

Dr. Eithan Haim is a general surgeon who now serves a small community in Texas. He completed a five-year general surgery residency

program at Baylor College of Medicine (BCM) in Houston, Texas. Faculty and residents at BCM serve numerous hospitals in the Texas Medical Center, including Texas Children's Hospital (TCH). During his residency, Dr. Haim rotated many times through these various hospitals, typically for a little longer than a month at a time.

During Dr. Haim's residency, the issue of transgender medical interventions on minors became a matter of public importance. On February 18, 2022, the Texas Attorney General issued a formal opinion that certain chemical and surgical interventions done for purposes of gender reassignment, including those that cause temporary or permanent infertility, could violate Texas criminal child abuse laws.[1] TCH shortly followed that with a public statement on March 4, 2022 that it had "paused hormone-related prescription therapies for gender-affirming services" in order to "safeguard" its healthcare providers from "legal ramifications."[2] Nevertheless, as TCH recently admitted, it

---

[1] Tex. Attorney Gen., Attorney General Opinion No. KP-0401 (Feb. 18, 2022), https://www.texasattorneygeneral.gov/sites/default/files/opinion-files/opinion/2022/kp-0401.pdf.

[2] Emily Hernandez & Eleanor Klibanoff, *Attorney General Ken Paxton asks Texas Supreme Court to let investigations into transgender families continue*, THE TEXAS TRIBUNE (Mar. 21, 2022), https://www.texastribune.org/2022/03/21/texas-transgender-investigation-child-abuse-appeals-court/.

restarted those therapies almost immediately without any public acknowledgment or corrections to its previous public statement.[3]   On May 16, 2023, a journalist, Christopher Rufo, released a story revealing that the same transgender medical procedures that TCH said it had paused had actually continued unabated.  The story included several redacted medical records demonstrating that those procedures were ongoing.  The following day, the Texas Senate voted to pass Senate Bill 14 (SB 14), which prohibits physicians and health care providers from providing gender transitioning or reassignment procedures and treatments to minors.  The governor subsequently signed SB 14, and it is now Texas law.

A year after his residency ended, on May 29, 2024, the government obtained a four-count indictment against Dr. Haim.  Indictment, Dkt. No. 1. All four counts allege that Dr. Haim violated the Health Insurance Portability and Accountability Act (HIPAA) by knowingly obtaining individually identifiable health information—certain information about TCH patients—without authorization and for reasons other than

---

[3] Tex. Children's Hospital, Texas Children's Statement on Gender Care (Aug. 22, 2024), https://www.texaschildrens.org/content/press-release/texas-childrens-statement-gender-care.

permitted by HIPAA's provisions.  Count 1 alleges that he obtained four transplant patients' records under false pretenses.  *Id*. at 4.  Counts 2–4 allege that he obtained three other patients' protected information "with the intent to cause malicious harm to TCH's physicians and patients." *Id*. at 5.

Central to the government's case has been that Dr. Haim had no reason at all to be in TCH's medical records after he finished his last residency rotation at TCH in January 2021.  *Id*. ¶ 9.  The government alleged that after January 2021, Dr. Haim "did not return to TCH for any additional pediatric rotations or medical care," that in 2022 and 2023 he "did not treat or access any adult care patients during this time period at TCH," and that "no TCH pediatric or adult patients were assigned to Haim's care."  *Id*. ¶¶ 9, 12, 15.  The government's theory underlies the allegations for all counts that Dr. Haim obtained the information for reasons other than those allowed by HIPAA and "without authorization" and, for Count 1, that his seeking access "to urgently attend to adult care services" was under false pretenses.  *See id*. ¶ 11.

In the government's Pretrial Motions filed on September 6, 2024, Dkt. No. 33, it doubled down on these core assertions. For instance, it stated:

> After January 2021, the defendant had no patients under his care at TCH—either children or adults. (Ind. ¶ 9). As a result, the defendant's TCH login credentials lapsed due to inactivity. (Ind. ¶ 10). From September 2022 through April 2023, despite the fact that he had no patients at TCH, the defendant attempted to re-activate his TCH login credentials on numerous occasions. (Ind. ¶ 10). In January 2023, for example, the defendant emailed an administrator at TCH requesting remote access to the system because he needed it for "ACS" (adult care services) patient information. On April 19, 2023, the defendant emailed an administrator at TCH urgently requesting that his login credentials be restored so he could access "operative cases" he was "covering." This was a lie.

We know there is evidence demonstrating that these central contentions are incorrect. As Dr. Haim has separately submitted earlier today, Dkt. No. 39, the government informed the defense late on Friday, September 13, 2024, that TCH told the government that Dr. Haim assisted with patient care and even surgeries at TCH through at least April 14, 2024.

The government's now-disproven core theories form the basis for the pretrial motions and requests. In essence, the government asserts that this is a simple case—Dr. Haim had no involvement with TCH for

years at the time of the alleged crimes—so many avenues of potential defense should be foreclosed.  Regardless of recent developments, that is wrong, and many of their requests could necessarily not be decided before witnesses are even designated, even if they had merit—which they lack. But now, their requests are even more inappropriate because they are clearly based on a fundamentally incorrect understanding of what happened.  Accordingly, if the government continues to seek the relief it has requested, its Motion should be denied.

## ARGUMENT

### I.     The defense cannot be precluded from referring to Dr. Haim as a "whistleblower."

Dr. Haim stridently opposes the government's efforts to preclude the use of the word "whistleblower" before the jury.  That request is little more than an attempt to pre-judge the merits of the trial before the jury is empaneled.

#### A.     Even under the government's language-policing, it still cannot preclude Dr. Haim from being referred to as a "whistleblower."

The government uses various definitions to argue that a person can only ever be called a whistleblower if "the disclosure" goes "through proper, prescribed channels," which, for the government, means only to a

"health oversight agency, public health authority, or appropriate health care accreditation organization"—or, apparently, also a law enforcement agency, even though that is not explicitly listed in the HIPAA regulations it cites because other statutes and common sense would also permit that.[4] Even under this contrived definition, refuted below, the government still cannot say Dr. Haim does not qualify.

The indictment states that Dr. Haim "did not attempt to report or report any of his concerns to supervisors at BAYLOR or TCH," "to the anonymous hotline provided by BAYLOR[,] or to CPS."  Indictment ¶ 16. The Motion, however, goes much further, stating that Dr. Haim also "did not even try to report his concerns about treatment of patients with gender dysphoria to . . . some other governmental entity that could properly investigate."  It offers no support for any of these assertions.  In any event, the government has no clue to whom Dr. Haim spoke.  We know that because at the end of this very same Motion, the government requests reciprocal discovery of to whom he attempted to communicate, including TCH, Baylor, CPS, "State, local, or federal law enforcement,"

---

[4] Should this case progress, it will become increasingly obvious that HIPAA's byzantine regulatory scheme is not as clear as the government makes it out to be.

or "State, local, or federal government."   While the government demonstrated Friday night that there are plenty of facts it obviously doesn't know, it can't continue the farce that the evidence may be out there and that there is also no evidence.   Thus, even under the government's own definition, it must prove its case at trial without imposing its preferred label on the defendant.

### B.   Dr. Haim cannot be precluded from asserting that he had believed in good faith that he was blowing the whistle on fraudulent and wrongful conduct by TCH.

By way of its pretrial motion, the government has essentially asked this Court to issue a gag order preventing Dr. Haim, his defense team, or anyone else for that matter, from advancing the most natural defense theory—Dr. Haim is a whistleblower, who exercised his First Amendment right to call out what he believed, in good faith, was fraudulent and illegal conduct by TCH.   According to the very congressional report cited by the government: "whistleblowers are employees who report misconduct or illegal activity committed by their employers."   Congressional Research Services, Compilation of Federal Whistleblower Protection Statutes (Apr. 25, 2024), https://crsreports.

congress.gov/product/pdf/R/R46979.  The Legal Information Institute at

Cornell Law School agrees:

> A whistleblower is an employee who alleges wrongdoing by
> their employer (whether public or private), that violates
> public law or harms a considerable number of people.
> Whistleblowers expose information or activities within an
> organization that are illegal or unethical. They may report
> these issues internally or to external regulatory bodies, law
> enforcement agencies, *or the media.*

Legal Information Institute, *Whistleblower*, Wex, https://www.law.

cornell.edu/wex/whistleblower (emphasis added).

The statutes cited by the government do nothing to support its

effort to muzzle Dr. Haim.  None of them have anything to do with

whether someone can be or qualify as a "whistleblower."  Instead, most

of the statutes cited by the government ban retaliation against persons

who (1) are employed by public/governmental agencies and (2) report

crimes or wrongdoing to enumerated persons or agencies.  In this case

both BCM and TCH, where Dr. Haim worked, are private organizations,

so Dr. Haim has no redress from those laws against any retaliation

taking place against him.  Those statutes do not define who can or cannot

be called a "whistleblower," they merely protect certain categories of

whistleblowers from retaliation in the public sector.

The government's definition also materially misrepresents the content of HIPAA regulations.   The provision it cites regarding whistleblowers, 45 C.F.R. § 164.502(j), is commonly mistaken as being the only whistleblower provision, but it does not directly deal with whistleblowers at all.  Instead, it protects "covered entities" if a member of its workforce or business associate discloses protected health information under certain circumstances, including to reveal violations of the law or clinical standards.  *Id.*  In other words, it protects the hospital if an employee blows the whistle.  Although the provision indirectly recognizes the value of whistleblowing, on its own terms it does nothing for a whistleblower.

Instead, the HIPAA regulations have a separate section dedicated to "[u]ses and disclosures for which an authorization or opportunity to agree or object is not required."  45 CFR § 164.512.  Under this section, the regulations provide a multitude of ways for covered entities (hospitals and physicians alike) to use protected health information and to disclose it outside of the covered entity.   While this includes the types of disclosures to the entities discussed by the government, such as law enforcement, health oversight agencies, and public health agencies, it

includes other disclosure avenues not referenced by the government. In fact, the regulations include a safety valve provision that states:

> **Standard: Uses and disclosures to avert a serious threat to health or safety**—(1) Permitted disclosures. A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, *in good faith, believes the use or disclosure:*
>
> (i)
>
> (A) Is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public; and
>
> (B) Is to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat; . . .

45 C.F.R. § 164.512(j)(1) (emphasis added).

This provision has a few important features. It protects not only disclosures, but also any use of the information based on a good faith belief in the necessity of lessening threats to health. The disclosure, if there is one—the provision being so ambiguously drafted to say "use . . . to"—need not be to a government entity, or even anyone in any official capacity at all. Instead, it need only be to a person reasonably able to lessen the threat. This extraordinarily broad potential audience was intentional—in drafting the regulations, the Department of Health and Human Services considered whether to limit to whom a protected disclosure could be made and decided against it, lest it would in any way

11

reduce the chance that harm could be prevented. Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82703 (Dec. 28, 2000). Relatedly, the provision explicitly *presumes* that there was a good faith belief if the person using or disclosing the information had appropriate knowledge. 45 C.F.R. § 164.512(j)(4).

Dr. Haim may rely on this extremely capacious defense (expanded by its own ambiguity) at trial. If Dr. Haim had the appropriate intent, then his use and disclosure of the information described in the indictment, even as allegedly made to someone other than a government or corporate official, was legally protected and undoubtedly qualifies him as a "whistleblower." And "ultimately, the decision on the issue of intent must be left to the trier of fact alone." *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979).

### C. Use of the word "whistleblower" is not evidence, and, therefore, not excludable under Federal Rules of Evidence 401 and 403.

Evidence is "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact." *Evidence*, BLACK'S LAW DICTIONARY (12th ed. 2024). Yet the government does not explain how anyone using the term

"whistleblower" makes it evidence under the federal rules.  If Dr. Haim or his counsel choose to call Dr. Haim a "whistleblower," that is not evidence—it is at most argument, merely a descriptive term expressing a view believed to be true.  Indeed, it is the government that has chosen to preemptively use inflammatory epithets and descriptions in these proceedings, calling Dr. Haim a "leaker," a liar (this/that statement he made "was a lie"[5]), and someone who "covertly" accessed medical records. Dkt. No. 33 at 2–4, 5.  While Dr. Haim would prefer that the government refrain from this conduct,[6] there is no evidentiary basis for the government to ask the Court to prevent Dr. Haim from establishing his defense at trial that he was a whistleblower, including that he reasonably believed in good faith that he was complying with the law when he revealed that TCH was defrauding the public by performing procedures on minors after claiming it had discontinued them.

---

[5] As noted in Dr. Haim's Renewed Motion for a Continuance, Dkt. No. 39, we now know that the government was the one not accurately representing the truth about Dr. Haim.

[6] *See* AM. BAR ASS'N, CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION, (2017), Standard 3-6.5 Opening Statement at Trial ("The prosecutor's opening statement should be made without expressions of personal opinion, vouching for witnesses, inappropriate appeals to emotion or personal attacks on opposing counsel."),                    https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition/.

The government also argues that Rule 403 precludes Dr. Haim or his defense team from uttering the word "whistleblower" during the trial because it would cause undue prejudice to the government.  As shown, the term is not evidence, but it is at the crux of the case.  It is not unduly prejudicial for Dr. Haim to present his legitimate defense or to argue his reasonable belief in a case involving charges of malicious intent.  Dr. Haim must be given the chance to show that he is a whistleblower in both the vernacular and any relevant legal sense.

Moreover, the government fails to cite any case where a similar gag order was granted on use of the term "whistleblower."  To the contrary, several courts have rejected one.  In *Cook v. CTC Communications Corp.*, the defendant moved *in limine* to preclude the plaintiff from referring to herself as a "whistleblower."  No. 06-58, 2007 WL 3331532 (D.N.H. Nov. 2, 2007).  The court denied the motion after reviewing the different statutes and contexts for the term "whistleblower," concluding:

> "Whistle-blower" is a descriptive term commonly used and understood in a variety of legal and nonlegal contexts to refer generally to a person who informs on somebody else.  In the context of this case, the use of the term will not be unfairly prejudicial to the defendant.

*Id.* at *1.  Anther court rejected a similar motion:

14

> Stringing together a cartload of largely irrelevant and non-binding state court decisions, counsel for defendant moves that plaintiffs' counsel should be barred from using terms such a "victims," "victimized," and "whistleblower" during the trial. Recently, in *Fields v. Bayerische Motoren Werke Aktiengesellschaft*, this Court rejected a nearly identical motion *in limine*, holding it up as an example of applications "seek[ing] relief so very inconsequential that their filing only highlights counsels' failure to reasonably engage with each other in anticipation of trial." No. 18-CV-2889, 2022 WL 905129, at *2 (E.D.N.Y. 2022) (rejecting *in limine* motion seeking to bar the use of the word "victim" by plaintiff).

*Hernandez v. Money Source Inc.,* No. 17-6919, 2022 WL 2702894, at *5–6 (E.D.N.Y. July 12, 2022) (citations omitted). To preclude the jury from considering Dr. Haim's actions as a whistleblower would severely wrong him.

Yet even if "whistleblower" were not an appropriate term—supported by common usage, law, and legal defenses here—and instead the inflammatory bogeyman the government makes the word to be, it would still be too early to categorically exclude the term's use. *See Rivera v. Robinson*, 464 F. Supp. 3d 847, 853 (E.D. La. 2020) (holding that a motion *in limine* should exclude only clearly inadmissible evidence and that the party's effort to exclude an inflammatory term was "premature").

The government's motion to preclude the use of the term "whistleblower" before the jury is unreasonable and would deny Dr. Haim

15

from putting on his defense as is allowed by the Constitution, the Federal Rules of Evidence, and other law. The government's Motion on this point should be denied.

## II.  It would violate Dr. Haim's rights and would be premature to limit testimony and argument regarding issues pertaining to transgender care

The government next seeks to limit testimony and argument regarding pediatric transgender procedures. Yet the government fails to offer even clear delimiters on the testimony or argument it seeks to exclude other than evidence that is irrelevant and unduly prejudicial—the basic standard for all admissible evidence. This motion, like that for excluding use of the term whistleblower, is little more than an attempt to pre-judge the issues and should be denied. *See Rivera*, 464 F. Supp. 3d at 853.

The government's own assertions in its motion contradict each other. On the one hand, the government states that transgender procedures on minors is "a hot-button political issue" that "is unrelated to the central factual question of the case." It also states that the case "is *not* about the merits of TCH's practices or public statements; and it is *not* about what transgender care for minors entails, what the short or long-

term outcomes for such patients may be, or whether puberty blockers or other medical services for these patients are helpful, harmful, medically indicated, or morally or politically correct."  On the other hand is the government's entire case.  As the government recognizes in its motion, it "does not dispute the defendant's ability to offer relevant testimony that goes directly to the issue of mens rea."  The government cannot dispute that because it has placed Dr. Haim's intent regarding transgender care at the center of Counts 2–4, the most serious felonies in the case, by alleging that he disclosed redacted health information "with the intent to cause malicious harm to TCH's physicians and patients"—meaning the doctors providing transgender procedures and the patients receiving them.  Thus, Dr. Haim's knowledge and belief of transgender procedures, and those at TCH, is relevant and not excludable because of the government's basic choices in charging this case.

But the issues are even broader.  It is the government who has alleged that in order to accomplish his alleged malicious intent—"to damage the reputation of TCH and its physicians and to promote his own personal agenda"—that Dr. Haim "intentionally contacted a media outlet to *grossly mischaracterize* TCH's medical procedures."  Indictment ¶ 19

(emphasis added).   The government states that it may call TCH employee(s) to "testify for the Government regarding, as background and on a high level, what surgical services TCH offered for minors with gender dysphoria" and what the medical records reflect about those "services."   Rebutting these allegations and this evidence requires evidence beyond mere intent—it gets into the facts of what the TCH medical procedures were and how they match the characterizations at issue.

That does not even touch other defenses Dr. Haim may have. Regarding the transgender procedures themselves, as discussed above, HIPAA contains a safety-value exception that depends on a good-faith belief in lessening a threat to health.  The context of Dr. Haim's actions is also critically relevant.  TCH publicly stated that it had paused the transgender procedures at issue here.  It restarted them immediately without public notice.  This public deception likely motivated the disclosures at issue, and therefore goes not only to intent, but is also relevant to other defenses that Dr. Haim may present—as noted above, the government appears to have no idea of Dr. Haim's interactions with government entities.  Indeed, even the government's citation to cases

excluding testimony about "what the law ought to be" are inapt because the law in Texas now makes these procedures *illegal*.

Dr. Haim does not seek to turn this case into a "referendum on transgender care." Nor does he need to. But it is the government that has made many inflammatory accusations and has built into its case disputes over transgender procedures in general and TCH's procedures in particular. If the government believes that it "is easy to imagine" how the case could "devolve into a back-and-forth battle of witnesses," it should have been more careful in exercising its power to charge a crime or, at minimum, in drafting its indictment. It cannot simply now ask that the Court "strictly limit the admissibility of testimony or argument on these inflammatory topics."

## III. The Court should not broadly preclude evidence or argument about the government's motivations or calling into question the government's thoroughness in its investigations and prosecution.

In sections III and VI of its Motion, the government seeks to "preclude evidence or argument regarding the Government's supposed motives for prosecution" or "claims of political persecution or prosecutorial misconduct" and then to force the defense to "refrain from

19

making derogatory and unfounded comments about the prosecutors or law enforcement agents." Both these requests sweep far too broadly.

Despite the recent *Brady* disclosures detailed in the defense's separate filing, the defense is not as of now advancing a selective prosecution claim, nor would it attempt to advance one before the jury. But the government's "motivations" may matter to the substance of the alleged crimes in many ways. The federal government is in active disputes with the State of Texas over the legality of pediatric transgender procedures.[7] The federal government has alleged that Dr. Haim had HIPAA training on reporting concerns but did not use it. Indictment ¶ 9. It repeated that in its pretrial motion, and also accused Dr. Haim, without support in the allegations, of not even attempting to notify any government body of his concerns. The government has made Dr. Haim's ability to "blow the whistle" to the federal government a key theme of its prosecution.

---

[7] As noted above, the Texas Attorney General took the position that the procedures could be criminal, and the State confirmed that they are illegal only days after the disclosures at issue in this case. By contrast, the federal government has repeatedly taken the position that the procedures are not only permissible, but that federal law requires that they be provided, including in a recent rulemaking. In response, the State of Texas has moved to stay that rule, and the federal regulation is currently enjoined nationwide in that case and others. *See, e.g.*, Order Modifying Stay, Dkt. No. 41, No. 6:24-cv-00211 (E.D. Tex. Aug. 30, 2024).

Yet given the federal government's current policy, any whistleblowing to it of concerns that TCH's transgender procedures were illegal would have failed to accomplish anything other than making Dr. Haim a subject of scrutiny. The defense must be able, should the government make the argument, of rebutting it by testimony or other evidence of the federal government's defense of these procedures and unwillingness to take seriously the same concerns that the State of Texas takes very seriously. If this "politicizes" things, that results straightforwardly from the government's decision to charge the case as it has.

Similarly, the defense has no intention of making "unfounded comments" about the prosecutors or law enforcement agents. Yet it fully intends to make well-founded arguments and elicit testimony that carefully interrogates the accuracy of their investigation. There can be no dispute that the government's investigation as of now *deserves* to be fully scrutinized; the predicate was laid Friday evening. Nor can the defense be constitutionally precluded from criticizing the accuracy of the government's investigation; that will go directly to whether the government has proven their case beyond a reasonable doubt.

Likewise, the defense must necessarily be able to probe the bias of witnesses, including not only those of TCH but also of any law enforcement witnesses. Indeed, in the same case that the government principally relies on to establish that the prosecution's motive in bringing a case ought not be attacked, the court allowed the defendants "to ask questions of any government agents designed to impeach their credibility and/or to expose potential biases." *United States v. Cleveland*, No. 96-207, 1997 WL 253124, at *4 (E.D. La. May 14, 1997).

Accordingly, and especially given the state of the government's indictment in light of the evidence, the Court should not issue any order *in limine* regarding these issues.

## IV. Testimony that the defendant is a good doctor is permissible character evidence.

The government also seeks to preclude character evidence regarding Dr. Haim because it asserts that the case is not about "defendant's skills as a doctor" or "whether the defendant is a good or bad doctor or a good or bad person." Instead, the government asserts that the case is "about whether he obtained and/or disclosed patients' medical files without authorization *with the requisite intent*." Mot. at 22 (emphasis added). That the government does not mention that "requisite" intent in

this section by itself reveals the poverty of the government's argument—Dr. Haim's character of "a good doctor who helped and cared for his patients" is absolutely relevant to whether he had the "intent to cause malicious harm to TCH's physicians and patients."   And federal law allows him to present such character evidence.

As the government recognizes, Rule of Evidence 404(a)(2)(A) allows the defendant to "offer evidence of the defendant's pertinent trait," meaning one that is directly relevant to the charges at issue.  *See, e.g.*, *United States v. Hewitt*, 634 F.2d 277, 278 (5th Cir. 1981).  Evidence that the defendant is a law-abiding citizen "is always relevant."  *Id.* at 279. And when the issue is intent—whether the defendant "acted with a prohibited mind set"—character evidence "is not only relevant, but also vitally important."  *United States v. Yarbrough*, 527 F.3d 1092, 1101 (10th Cir. 2008).  *See also United States v. De Leon*, 728 F.3d 500, 505 (5th Cir. 2013) (finding that the district court erred in excluding character testimony regarding defendant's law-abidingness where his mental state was "a sharply controverted question going to the heart" of his defense).

Here, the government attempts to address all this by simply confusing the issues, including citing inapt cases (for instance, whether a reputation of being a "family man" is relevant to narco-trafficking), mixing in with citations the general prohibition on citing specific good acts to prove character in conformity therewith, and unduly narrowing the character at issue to whether Dr. Haim is skilled with a scalpel. Dr. Haim must be permitted to offer character evidence bearing on his state of mind; that is not unfairly prejudicial. The government cites no cases at all that accept such an argument. And if the jury is "swayed to acquit" based on such evidence, it is again because of how the government charged the case—it will be because there is reasonable doubt that a doctor who has a reputation of caring for patients instead determined to maliciously harm children.

## V. Dr. Haim may offer his own out-of-court statements under many exceptions to hearsay.

The government seeks to preclude Dr. Haim from offering "any of his own out-of-court statements to prove the truth of the matters asserted" because "such statements would be inadmissible hearsay." The government cites no authority for making this broad determination *in limine*, and its argument flouts the law in multiple respects. As a court

ruled only earlier this year, when the United States sought to preclude the defense from "mentioning, eliciting, offering, or using Defendant's own statements as self-serving hearsay," "that request conflicts with the amendment to Rule 106, which expressly allows for rule-of-completeness evidence 'over a hearsay objection,'" and it "also conflicts with Rule 803, which may allow [the defendant] to introduce hearsay evidence under exceptions." *United States v. Mayfield*, No. 3:22-CR-31, 2024 WL 86864, at *1 (S.D. Miss. Jan. 8, 2024) (citing Fed. R. Evid. 106).

Taking those in reverse, there are numerous exceptions to hearsay under Rule 803. A particularly relevant one is Rule 803(3), a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan)." While the government casts Dr. Haim's statements to the media "about his reasons and justifications" for his actions as merely "self-serving," if these were contemporaneous with the charged conduct, they would be independently admissible. The next exception concerns a statement "reasonably pertinent" to "medical diagnosis or treatment" and that "describes medical history." Fed. R. Evid. 803(4). There are many situations that this is potentially relevant to a physician raising concerns with a treatment protocol. There are also various exceptions for

records and recorded information.  *See id.* 803(5), (6).  Accordingly, there are many ways that Dr. Haim's prior statements could come in evidence.

Another more general exception is Rule 106, which requires allowing the introduction of a writing or recorded statement when it "in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  This determination can only be made on a statement-by-statement basis. *See id.*  It is therefore appropriate to consider the issue only at the time a specific statement is offered for admission in evidence.  *United States v. Hagen*, 485 F. Supp. 3d 737, 742 (N.D. Tex. 2020), *aff'd*, 60 F.4th 932 (5th Cir. 2023).

## VI.    The defense must be permitted to use prior witness statements, even summarized in an interview report.

The government seeks to prevent defense counsel from "using" the interview reports it has turned over in discovery to impeach the government's witnesses at trial.  It justifies this request with an assertion that an "interview report has no impeachment value unless it has been adopted by the witness or it reflects a substantially verbatim transcription."  That grossly misstates the law, and the government's request has no legal grounding.

The government cites no cases in which a similar *in limine* instruction was given. Instead, it cites several Jencks Act cases. It appears that the last in the government's string citation is the crux—it attempts to equate "statement" in the Jencks Act to "statement" in Federal Rule of Evidence 613(b) regarding admitting a witness's prior statement as extrinsic evidence. It offers no authority for this proposition.

The limitation on statements to be delivered under the Jencks Act does not control Rule 613. Rule 613's concept of a statement that can be used for impeachment is extraordinarily broad because the statement need not be admitted as evidence, authenticated, or even admissible to be used. *See Great W. Cas. Co. v. Rodriguez-Salas*, 436 F. App'x 321, 325 (5th Cir. 2011). Indeed, counsel can even impeach with mere summaries of prior statements because the purpose is to prod testimony, not serve as substantive evidence. *See id.* at 325–26; *United States v. Crinel*, No. CR 15-61, 2016 WL 6441249, at *4 (E.D. La. Nov. 1, 2016) (noting that agent's interview notes can be used to impeach the witness). And if the witness agrees to adopt or approve the agent's summary at trial, or if it is shown to be verbatim, it is a "statement" even under the Jencks Act,

27

*United States v. Welch*, 810 F.2d 485, 490 (5th Cir. 1987), and admissible as extrinsic evidence under Rule 613(b), *Crinel*, 2016 WL 6441249, at *4.

Interview reports may be used for other purposes at trial. For instance, they may be used to refresh a witness's recollection—either the agent himself or the interviewee. *See, e.g.*, *J.H. Rutter Rex Mfg. Co., Inc. v. NLRB*, 473 F.2d 223, 240–41 (5th Cir. 1973) (holding that the trial court erred in not allowing the witness to review an investigative file to refresh his memory); *United States v. Brown*, 303 F.3d 582, 590 (5th Cir. 2002) (noting that during trial an agent was allowed to use the 302 report prepared by another agent to refresh her recollection).

Accordingly, there are many "uses" of interview reports that are permissible at trial, and the defense should not be precluded from them.

## VII. The Defense should not be precluded from raising any valid defense at trial, including advice of counsel or good faith defenses.

In its Motion, the government further mistakenly asserts that an advice of counsel or other *mens rea* defense is unavailable to Dr. Haim because "HIPAA does not include willfulness as an element of the offense" and instead "the mens rea requirement is 'knowingly,' a lower

standard that requires only that the defendant acted voluntarily and intentionally and not because of mistake or accident."

Tis not how the government charged this HIPAA case. Instead, the indictment alleges specific intent crimes. Count 1 alleges that the defendant "obtained individually identifiable health information *under false pretenses*." Indictment at 4 (citing 42 U.S.C. § 1030d-6(a)(2) and (b)(2)) (emphasis added). Counts 2–4 charge Dr. Haim with "obtain[ing] and/or wrongfully disclos[ing] individually identifiable health information *with the intent to cause malicious harm*." *Id.* at 5 (citing 42 U.S.C. § 1030d-6(a)(2) and (b)(3)) (emphasis added).

Specific intent crimes require that the defendant intentionally commit an act and intend to cause a particular result when committing that act. *United States v. Blair,* 54 F.3d 639, 643 (10th Cir. 1995). The indictment charges Dr. Haim with specific intent crimes because intent is necessarily an element of the offenses charged. In other words, did he intend to cause malicious harm when he obtained the medical information? Or did he obtain the medical information by intending to deceive or mislead? An instructive example of a statute that does not contain "willfulness" yet still amounts to a specific intent crime is wire

29

fraud, 18 U.S.C. § 1343.  As such, it is subject to the typical defenses that can negate specific intent, like reliance on advice of counsel or a good faith defense.  *See, e.g., United States v. Casperson*, 773 F.2d 216, 223 (8th Cir. 1985); *see also* Laura A. Eilers & Harvey B. Silikovitz, *Mail and Wire Fraud*, 31 Am. Crim. L. Rev. 703, 719 (1994) (and cases cited). Moreover, and as discussed in more detail above, the HIPAA regulations include a *mens rea* defense to potential HIPAA violations under certain factual circumstances.  *See* 45 C.F.R. § 164.512(j)(4).

Dr. Haim's state of mind will play an important role in this trial. The government's motion to preclude Dr. Haim's *mens rea* defenses should be denied.

## VIII. The Court also should not grant an additional discovery order.

The government seeks an order compelling Dr. Haim to produce reciprocal discovery pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A) and (B).  It should be denied.  This request took some gumption for the government to file.  As the government should be well aware, before there is any obligation to produce discovery by Dr. Haim, Rule 16 requires that the Government first comply with Dr. Haim's discovery requests.  This has not yet happened.  In fact, as described in

the defense's filing earlier today, Dkt. No. 39, the government only last Friday the 13th made an after-hours *Brady* disclosure that undermines the entire indictment, and late Sunday night acknowledged that it had yet to respond to the defense's Rule 16 requests.  The government's *Brady* disclosure revealed that there is a tremendous volume of exculpatory records yet to be produced by the government.

That said, even once the government does comply, under Rule 16(b)(1) the defense need only provide the evidence the government seeks here *if* the defense intends to use the evidence in its case-in-chief at trial.

In any event, the defense will fulfill its obligations under the local rules and the Federal Rules of Criminal Procedure, but neither require providing information regarding witnesses or their testimony in advance of trial.

In short, counsel for Dr. Haim fully understand their obligations and will fully comply with them.  But the Motion should be denied.

## **CONCLUSION**

WHEREFORE, the defendant respectfully asks the Honorable Court to deny the government's Pretrial Motions.

Dated: September 16, 2024

Respectfully submitted,

Marcella C. Burke
TX State Bar 24080734
SDTX No. 1692341
Burke Law Group, PLLC
1000 Main St., Suite 2300
Houston, TX 77002
Tel: 832.987.2214
Fax: 832.793.0045
marcella@burkegroup.law

Ryan Patrick
Attorney-in-Charge
TX State Bar 24049274
SDTX No. 3006419
Haynes and Boone LLP
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel: 713.547.2000
Fax: 713.547.2600
ryan.patrick@haynesboone.com

Jeffrey A. Hall
VA State Bar 82175
SDTX No. 3885025
Burke Law Group, PLLC
2001 L. Street N.W., Suite 500
Washington, D.C. 20036
Tel: 832.968.7564
Fax: 832.793.0045
jeff@burkegroup.law

Mark D. Lytle
DC Bar 1765392
SDTX No. 3884197
Nixon Peabody LLP
799 9th Street NW, Suite 500
Washington, D.C. 20001
Tel: 202.585.8435
Fax: 202.585.8080
mlytle@nixonpeabody.com

**ATTORNEYS FOR DEFENDANT EITHAN DAVID HAIM**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that a true and correct copy of the above and foregoing document has been filed and served on September 16, 2024 using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Marcella C. Burke*
Marcella C. Burke
