# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**UNITED STATES OF AMERICA** §
§      **Criminal No. 24-CR-00298**
**V.** §
§
**EITHAN HAIM** §

## DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION FOR A GAG ORDER

The government moves for a "gag order" on Dr. Haim and his counsel to prevent either from making any public statement, including on social media, that "could interfere with a fair trial." Dr. Haim opposes this extraordinary motion.[1] It represents the culmination of an abusive and incompetent prosecution and a bad faith attempt to shield the prosecutors from mounting criticism. The motion would abuse the judicial process and deprive Dr. Haim of his core constitutional rights.

The government has impressed its investigative and prosecutorial powers in service of intimidating Dr. Haim into silence on a matter of great public concern. It has aggressively pursued him with little regard for the merits, the facts, or the law. Dr. Haim's sole recourse has been his First Amendment rights to speak to the media, the public through social media, and to any official who would hear him. Until now, the defense has not brought the full extent of the prosecution's egregious misconduct

---

[1] The government did not confer with the defense on this motion per Local Rule 12.2.

1

to the Court's attention to avoid distracting from Dr. Haim's meritorious defenses. But because the government has squarely joined the issue, the defense now provides an account in response.

In summary, the prosecution's motion demonstrates no "substantial likelihood" that the public statements, which concern the prosecution's misconduct rather than underlying evidence, will preclude a fair trial or that the proposed gag order is narrowly tailored or the least restrictive means. This case lacks the exceptional circumstances justifying the order the prosecution copies. And there are additional rights implicated here, including Dr. Haim's right to speech on a matter of public importance, to call attention to prosecutorial misconduct, to petition the government, to raise money for his defense, and to defend his reputation. Statements on certain social media will not taint a jury drawn from the diverse 13-county Houston division.

The prosecution's motion is also made in bad faith and an attempt to insulate itself from criticism and the repercussions of its incompetence. The prosecution has selectively sealed filings and moved for protective orders to protect itself while showing little regard for the purported victims.

Finally, the assertion that defense counsel has violated ethics rules is baseless. The Court should deny the prosecution's motion.

# BACKGROUND

## I. The prosecution's misconduct pervades this case.

The government has abused its prosecutorial power from the very beginning, and it is all a matter of public record. Ex. A.[2] In May 2023, journalist Christopher Rufo exposed that Texas Children's Hospital (TCH) was performing pediatric transgender procedures despite claiming to have paused them; he published redacted TCH medical records proving this. On June 23, 2023, Department of Health and Human Service (HHS) Office of Inspector General agents visited Dr. Haim's home. When Dr. Haim declined an interview, they delivered a target letter from the since-removed lead prosecutor. In an email exchange with undersigned counsel, she confirmed that he was already a "target." Yet in counsel's first conversation with her, she admitted that she had not reviewed the evidence against Dr. Haim and was relying solely on the investigating agents' characterization. Although she also acknowledged being unfamiliar with HIPAA and not knowing the statutory citation (as later reflected in the indictment), she immediately threatened Dr. Haim with a felony—which would require the enhancements that ended up in the indictment—unless he apologized. The prosecutor always intended to pursue the most aggressive charges without regard to the facts or the law.

---

[2] The government's misconduct during the investigation and before indictment is recounted in a letter from Dr. Haim's counsel to the U.S. House of Representatives Judiciary Committee and Select Subcommittee on the Weaponization of the Federal Government. Congressman Chip Roy published this letter on the same social media used by Dr. Haim.

At the same time, this heedless approach resulted in the prosecution making glaring errors from the start. In that same first meeting, the lead prosecutor insisted that the redacted medical records published had included children's names. That was obviously false. A quick glance confirmed as much. Yet she insisted that this was the case through calls and email exchanges over several months until finally confronted with the evidence that the agents sent her. Even then, she maintained that Dr. Haim had released personal information, and despite acknowledging that she was not sure what information HIPAA protects, she threatened to take Dr. Haim to a jury trial "on a technicality" and without concern for losing.

Also in the first call with counsel, the prosecutor threatened Dr. Haim's wife, who was going through a federal background investigation to become an Assistant U.S. Attorney. Mrs. Haim had suggested that Dr. Haim not speak with federal agents without counsel, so the prosecutor claimed that Mrs. Haim had interfered with the investigation. The prosecutor promised not to mention this to background investigators "unless [Mrs. Haim] becomes difficult." The prosecutor raised Mrs. Haim's purported interference again on a later call unprompted.

All this and more motivated Dr. Haim to come forward publicly in January 2024 as the source for the Rufo story about TCH and reveal the government's misconduct. In response, the government ramped up its investigation, conducting witness interviews, and obtaining an indictment in May 2024. When Dr. Haim's

counsel met with the lead prosecutor and the FBI case agent after arraignment, they confirmed that DOJ had decided to indict Dr. Haim because he made the public statement. They also revealed that HHS had been unwilling to recommend prosecution (understandable because TCH had told HHS that Dr. Haim had "approved and authorized access" to the medical records, Dkt. No. 89 at 4 n.3) but that the FBI pushed to pursue the case.

At this point in the timeline, the prosecution's misconduct became part of the judicial record. The original indictment was founded on lies that in other situations would be actionable slander. *See* Dkt. Nos. 1, 39. It portrayed Dr. Haim as an interloper with no connection to TCH after January 2021. The false pretenses charges were premised on his falsely claiming responsibility for non-existent TCH patients to gain access to TCH records. And the most serious charges were premised on an "intent to cause malicious harm" to child patients by "grossly mischaracterize[ing] TCH's medical procedures" to "promote [his] own personal agenda." Dkt. No. 1, at 4–5.

The government should have known that the core allegations were false. Its own evidence, which it provided the defense in discovery, disproved them. It showed that TCH itself considered Dr. Haim to have continued to cover TCH patients into April 2023 and that Dr. Haim provided care to TCH patients long past January 2021. Dtk. Nos. 39 at 2; 84 at 3, 5–6. The government attorneys had again seemingly not

bothered to review the evidence or learn the facts yet had proceeded with the most serious charges they could muster. The government has all but admitted that it negligently sponsored false information to the grand jury. Dkt. No. 88 at 8–10. It was forced to strip the false allegations from the superseding indictment, gutting the core of its case and leaving little explanation for the false pretenses charge. And the government likewise was forced to drop the other salacious allegations, including that he intended to harm child patients and do so for his "own personal agenda."

Yet the government attorneys exercised no more care after these setbacks. The superseding indictment not only repeated a reference to a non-existent statute—the attorneys did not even bother to copy the correct language from another case—but it also added a non-existent crime duplicitously. Dkt. No. 91 at 16–18. And when confronted with the regulatory, statutory, and constitutional infirmities in its legal theories in a motion to dismiss, the prosecution team threw together an opposition in three business days and filed it only hours before election returns on November 5, 2024. Dkt. No. 93. The opposition effectively conceded that the Privacy Rule— the true core of HIPAA and a major rulemaking corpus maintained by HHS and authorized by Congress—was defunct. Its interpretation of "without authorization" directly contradicted the position taken by the Solicitor General before the Supreme Court. There is no way possible that the U.S. Attorney's Office consulted, much less cleared, these remarkable departures from DOJ and HHS positions with the Solicitor

General's Office, DOJ's Computer Crime and Intellectual Property Section, or HHS's Office of Civil Rights. Now, after stating twice on the record that the government would not seek a superseding indictment, the lead prosecutor was terminated from the case without explanation[3] and the remainder of the prosecution team has filed an even more minimal superseding indictment.

The misconduct throughout the investigation and prosecution is truly exceptional. Undersigned counsel includes three former DOJ prosecutors who each also served in DOJ supervisory roles over criminal components. Each believes that this case represents the zenith of misconduct, the worst that we have directly encountered in our careers. It is a stain on the DOJ and the administration of justice.

## II.    Dr. Haim's only recourse has been public statements.

Dr. Haim's saving grace has been the rights guaranteed by the Constitution to participate in the public square and petition the government publicly. Dr. Haim has used his rights to expose misconduct and seek accountability, first for TCH, and then for the government's attempts to cow him into submission and make an example of him for whistleblowers who oppose the federal government's policy preferences.

The underlying issue of pediatric transgender procedures is a matter of great public concern, and Dr. Haim's revelations have been at the center.[4] In 2022, the

---

[3] While the government has provided no public justification, the lead prosecutor performed some of the work in the case during a period in which her only bar license was suspended. Dtk. No. 49.
[4] This history was recounted in greater detail with citations in the Defendant's Response to Government's Pretrial Motions, Dkt. No. 41 at 2–3.

Texas Attorney General issued a formal opinion that those procedures could constitute criminal child abuse. While TCH then announced that it had "paused" those procedures, it restarted them almost immediately without any public acknowledgment. Rufo's story revealed that the procedures had continued unabated. The next day, the Texas Senate passed Senate Bill 14, which made them illegal. It is now Texas law. Shortly after the story was released, the Texas Attorney General also initiated an investigation into TCH for performing those procedures.[5]

Yet the issue has a national scope, too. The Biden Administration has made promoting pediatric transgender procedures a seminal priority. HHS issued guidance (now enjoined) stating that the HIPAA Privacy Rule prevents disclosure of patient information about transgender procedures and implicitly threatening prosecution of whistleblowers like Dr. Haim.[6] HHS promulgated regulations (now stayed) requiring that hospitals provide those procedures, Dkt. No. 41 at 20 n.7, and is even challenging state laws prohibiting the procedures at the Supreme Court, *see United States v. Skrmetti*, No. 23-477. The issue was a central feature of the 2024 Presidential election. Dr. Haim has participated in this national political conversation, which will decide the procedures' legality beyond Texas's borders.

---

[5] Press Release, Tex. Att'y Gen. (May 19, 2023), https://www.texasattorneygeneral.gov/news/releases/paxton-announces-second-investigation-texas-hospital-potentially-unlawfully-performing-gender.

[6] HHS Office of Civil Rights, HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy (Mar. 2, 2022), https://www.hhs.gov/sites/default/files/hhs-ocr-notice-and-guidance-gender-affirming-care.pdf.

Dr. Haim has also entered the national political conversation about the weaponization of federal law enforcement. By exposing the prosecution's abuse of power in the media, he hoped to garner the attention of the Legislative Branch and of other officials to ensure that the government holds its own accountable. This strategy has been effectual. National media outlets have covered the government's misconduct, and everyone from elite legal commentators to public intellectuals and media personalities have opined. U.S. Senators and Representatives have expressed concerns, submitted questions, and engaged in oversight.[7]

At the same time, Dr. Haim's public discussion of the case has allowed him to defend himself. The public has generously donated to his legal defense fund, which has enabled him to meet the charges head-on.

Throughout all of this, the government has consistently attempted to silence and intimidate Dr. Haim through abusing all power at its disposal. The rapid investigation and presentation of a "target letter," the prosecutor's threat of a felony prosecution before considering the evidence, and the little-veiled threats to Dr. Haim's wife were intended to suppress his public participation. Indeed, the prosecutor went so far as to say that it was not Dr. Haim's "job" to try to stop the

---

[7] The relevant correspondence includes letters from Senator Hawley to the Attorney General on June 20, 2024; from Senator Cruz to the U.S. Attorney on June 25, 2024; from Representative Crenshaw to the Attorney General and HHS Secretary on June 13, 2024; from Representative Roy to the Attorney General on June 27, 2024; and from Texas Representatives to the Texas Health and Human Services Commission on July 2, 2024.

pediatric transgender program and flippantly suggested that he should have put up a banner on the highway rather than talking to a journalist. The message was clear: the process would be part of the punishment if he continued to take his story public. And the prosecutor volunteered that she decided to bring charges only after he spoke out.

Since then, the government's actions have had the dual purpose of squelching criticism of the prosecution and silencing commentary on pediatric transgender procedures. By aggressively charging Dr. Haim with felonies using false allegations to depict him as a creepy intermeddler who sought to harm children, the government tried to destroy Dr. Haim's standing in the community, sap public support, and intimidate him into a plea. And now it has attempted to enlist the court in this scheme. In its pretrial motions, the prosecution's top concern was to prevent Dr. Haim from being referred to as a whistleblower, Dkt. No. 33 at 12, despite all precedent rejecting that, Dkt. No. 41 at 15–16. The government freely maligned him as a "leaker." *Id.* The prosecution also sought to restrict any discussion of pediatric transgender procedures except that which would help the prosecution, any discussion of government misconduct, and warranted criticism of the prosecutors and law enforcement agents. Dkt. No. 33 at 16, 18, 24. Had it not been for the providential revelation that TCH had records showing that Dr. Haim had treated TCH patients into 2023, contradicting the indictment and disrupting the trial schedule, the government would have pressed these motions.

Dr. Haim has refused to be intimidated. The gag order sought by the government must be considered in light of everything presented above. It represents the culmination of a systemic and lawless campaign of prosecutorial abuse.

## ARGUMENT

## I. The law provides no basis for the proposed gag order.

### a. *The gag order sought is an exceptional restriction unjustified here.*

A gag order is "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562 (1978). Gag orders operate as prior restraints and "face a well-established presumption against their constitutionality." *United States v. Brown*, 218 F.3d 415, 424–25 (5th Cir. 2000). Gagging trial participants requires showing a "substantial likelihood" that their extrajudicial commentary will undermine a fair trial, that the order is narrowly tailored, and that it is the least restrictive means available. *Id.* at 428.

Yet the prosecution believes that it is entitled to a gag order under *Brown* because Dr. Haim and his counsel have made public statements about this case. That is wrong. While *Brown* upheld a gag order based on exceptional circumstances, the Fifth Circuit has made clear that it was an unusual case.[8] It more recently struck down a local rule that prohibited extrajudicial statements or interviews on public

---

[8] In the other, unpublished case cited by the prosecution for the gag order, no one challenged its necessity and the sole issue was whether it was violated. *United States v. Hill*, 420 F. App'x 407, 409 (5th Cir. 2011).

communications media, making clear that gag orders are not to be entertained as a matter of course. *See In re Goode*, 821 F.3d 553, 562 (5th Cir. 2016).

The gag order in *Brown* was necessitated by two concerns. *First*, the combination of who was talking and what was being said made it likely that jurors would become familiar with potentially inadmissible evidence. The eponymous Brown was a prominent Louisiana state politician who had recently gone through re-election, and he was co-defendant with the former Louisiana governor and others in two criminal conspiracy cases (recently convicted in the first), with a third pending that included some of the same co-defendants. *Brown*, 218 F.3d at 418–19. During the re-election campaign, the defendants had released "transcripts of recordings of wiretapped conversations" and "participated in 'extensive interviews' while playing the recordings." *Id.* at 429. The government lawyer promised to "match any attempts by the defendants to gain an upper hand in the media coverage." *Id.* The district court had been concerned that inadmissible evidence—the wiretapped recordings—and "ex parte statements by counsel [or parties] giving their version of the facts" might interfere with impartial jury factfinding. *Id. Second*, there was already an unsequestered jury impaneled in the related criminal case, and the district court's "primary" concern with the whole affair was that extrajudicial comments would taint that jury. *Id.* at 429. Three related trials "created a heightened and somewhat unique danger." *Id.*

The situation here is no twin. Dr. Haim is a newly minted surgeon in a small North Texas suburb. He has no independent public stature and no local, state, or national audience apart from the government's pursuit of him. The publicity in this case has not concerned the evidence related to the alleged crime. Neither Dr. Haim nor his counsel have discussed Dr. Haim's access of medical records, his rotations at other hospitals, or the purported "false pretenses" beyond what is in the court record. Although the government references "public statements about the case, including interviews in which [Dr. Haim] . . . set forth his version of the facts," Mot. at 5, it provides not a single example of such "facts." Indeed, far more evidence has been of necessity disclosed in open court, including at hearings where defense counsel revealed what the evidence that the government provided in discovery showed, and in the various filings, *see* Dkt. No. 84 at 6. And to the minimal extent that Dr. Haim has tangentially discussed the underlying facts, the government has promised to *introduce* that as evidence at trial. *See* Dkt. No. 97 (government's motion in limine seeking to introduce a clip from an interview with Dr. Haim).

The government's paltry and conclusory assertions fail to "establish a nexus between the comments and the potential for prejudice to the jury venire," *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 494 (5th Cir. 2013). Trial participants' "propensity to make extra-judicial statements," even about the underlying facts, is insufficient to justify a gag order. *Id.* The government has made

no argument why criticism of the government's conduct, including in pretrial proceedings, will so thoroughly taint a Houston jury pool to prevent a fair trial on the merits. And it likewise makes no argument why a comprehensive gag order is "narrowly tailored" or the least restrictive means. Alternatives to gag orders include "change of venue, jury sequestration, 'searching' voir dire, and 'emphatic' jury instructions," and these alternatives must be considered first. *In re Goode*, 821 F.3d at 561 (quoting *Brown*, 218 F.3d at 431).

No trial is currently scheduled. All trial deadlines were terminated following the November 15, 2024 hearing. The defense will renew its motion to dismiss, and the difficult legal issues identified therein must be addressed. Depending on the Court's ruling, substantial pretrial motions practice may be necessary. There is as of now not even a hypothetical jury, much less one impaneled in a related case.

> b.    *The constitutional rights opposing a gag order are at their apex here.*

The case also presents critical countervailing interests not present in *Brown*. The court there merely gestured at First Amendment speech. *Id.* at 421, 424. Dr. Haim is no state politician and wields no political power. His and his counsel's public speech about the prosecution's misconduct—the focus of those statements—serves as his sole means to convince the Executive and Legislative Branches of the impropriety of the prosecution. Whether characterized as political speech or his right to petition for redress of grievances, these public statements are entitled to the

maximum of constitutional protection. A plurality of the Supreme Court expressed

this thought at length, collecting decades of Supreme Court jurisprudence:

> There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment. [The government] seeks to punish the dissemination of information relating to alleged governmental misconduct, which only last Term we described as "speech which has traditionally been recognized as lying at the core of the First Amendment." *Butterworth v. Smith,* 494 U.S. 624, 632 (1990). . . . "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 575 (1980). Public vigilance serves us well, for "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power. . . . Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *In re Oliver,* 333 U.S. 257, 270–271 (1948). . . .
> In *Sheppard v. Maxwell,* 384 U.S. 333, 350 (1966), we reminded that "[t]he press . . . guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism."
> Public awareness and criticism have even greater importance where . . . the criticism questions the judgment of an elected public prosecutor. Our system grants prosecutors vast discretion at all stages of the criminal process, see *Morrison v. Olson,* 487 U.S. 654, 727–728 (1988) (Scalia, J., dissenting). The public has an interest in its responsible exercise.

*Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034–36 (1991) (plurality op.).

Dr. Haim's efforts have succeeded. Congress has begun oversight of the

prosecution. Public scrutiny has pressured the U.S. Attorney's Office to resolve the

case justly.[9] And the case attracted substantial interest during the election and by individuals affiliated with the incoming presidential administration.

Dr. Haim's public statements have also protected his other interests. When the government indicted him on false allegations, they served as his only means of defending his reputation and standing in the community. And he did so responsibly, focusing on the government's misconduct rather than the underlying evidence.

The publicity has also been essential to securing Dr. Haim's Sixth Amendment rights. His criminal defense has been made possible solely by generous contributions to his legal defense fund. He has a right to raise and use funds for his defense. *See generally Luis v. United States*, 578 U.S. 5 (2016).

Finally, the importance of the larger issue of pediatric transgender procedures cannot be overstated. Dr. Haim has been at the center of the state and national conversation. His account of the misconduct by TCH and the federal government has informed everything from state law and investigations to national policy and the Presidential election. A gag order would be a quintessentially political act of retribution on a political opponent of the current administration in response to his and his allies' victories in the court of public opinion and the ballot box.

---

[9] "When the eye of the broader public is trained on a trial through the media, every participant in that process—judges, prosecutors, witnesses, and defense attorneys alike—faces judgment." Jessica Feinstein, *The Hybrid's Handmaiden: Media Coverage of the Special Court for Sierra Leone*, 7 Loy. U. Chi. Int'l L. Rev. 131, 136 (2010).

*c.*     *A gag order is also simply unnecessary.*

All that said, the Court has a simple alternative: it can follow Fifth Circuit precedent. After *Brown*, the Fifth Circuit struck down a gag order entered in a lawsuit against a police department, where the plaintiff officers "communicated with the media concerning the case and maintained a website" that contained "an image of" one of the parties to the suit, "excerpts of critical statements made in the media concerning" the defendants," "certain voice recordings of conversations between the Officers" and the police department, and "other accounts" of the department's "alleged failings." *Marceaux*, 731 F.3d at 490–91. That was still insufficient to justify a gag order. Dr. Haim's and his counsel's tweets cannot be more significant.

The current media environment attenuates any risk of prejudice. It is not the year 2000. "[I]n the past, it could be assumed that everyone would see a news broadcast or local paper. Nowadays consumers obtain information from dozens of news sources. As such, the mere presence of extra-judicial comments in some forms of media does not, by itself, establish the potential for prejudice of the jury venire . . . ." *Id.* at 494 n.4. Speaking to X users across the country does not make a fair trial impossible in Houston. The Court can take appropriate action during voir dire.

A gag order would also be counterproductive. Media following the case have focused on the prosecution's misconduct and malice. A gag order would correctly feed into this narrative and result in more coverage and outrage.

## II.     The prosecution seeks the gag order in bad faith.

The self-described "gag order" the government seeks serves as another means of its weaponizing and abusing the judicial system to insulate itself from criticism while silencing Dr. Haim and punishing him through legal process. This much should be apparent from the long history of the government's misconduct. But the prosecution's motion makes it plain. The chief complaint is that Dr. Haim and his counsel have posted "inaccurate and inflammatory descriptions of pretrial proceedings" on social media, including "falsely suggest[ing] that []Ms. Ansari is making up law and statutes in filings." Mot. at 6. The government states that these "inflammatory posts encourage the online bullying of prosecutors" and serve "as invitations to members of the media and the public to harass prosecutors." *Id.* In other words, the federal prosecution team feels entitled to avoid any criticism by the public of its incompetence and abuses of power.

This position jettisons any pretense of public officers supporting and defending the Constitution. "[C]riticism of public officials lies at the very core of speech protected by the First Amendment." *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999). But the position is also frivolous and in bad faith. To begin, the government filed the purportedly offensive tweets (which were available to anyone on social media) under seal, without good cause shown, so that they cannot even be discussed but for the prosecution's self-serving characterization. Yet even its

summary makes the request absurd. Simply put, Ms. Ansari did in fact "mak[e] up law and statutes in filings." She cited a non-existent U.S. Code provision *twice* and, more importantly, duplicitously charged a non-existent crime. Dkt. No. 91 at 16–18. Ms. Ansari had no explanation for these errors in court, and the government has now obtained another superseding indictment repairing these obvious deficiencies. This negligence in a serious criminal case warrants scrutiny and criticism.

The outrage over criticisms directed at Ms. Ansari is also absurd. Although the government filed its motion for the withdrawal of counsel under seal, the Court granted it on the public docket, Dkt. Nos. 104, 114, and it reflects that Ms. Ansari was terminated as counsel for the government the same day. If there is ever a jury, Ms. Ansari will not face them. This withdrawal would have afforded the government an opportunity for reflection and a chance to make its case that it had purged any trace of misconduct from the proceedings, except that it instead immediately superseded the indictment and sought a gag order. Furthermore, if the most "shocking" post was a re-tweet that "included a photograph of AUSA Tina Ansari" alongside criticism of her conduct, then the government's motion is truly vapor. While the photograph itself is under seal, a google search of Ms. Ansari returns multiple wire service images. In the first, she addresses the jurors in a murder trial in which the defendant was "charged with killing" a teenager "by shooting her once

in the back of the head execution-style . . . because she knew about an alleged drive-by shooting."[10] This case presents no such dangers.

The prosecution's actions to protect itself also constitute rank hypocrisy. This case is, after all, premised on the idea that Dr. Haim violated the medical privacy of children. The records published, though, had no individually identifiable information, and the names were completely redacted. Yet when the government filed its indictments, it repeatedly published the patients' initials, which can be matched to the information about their medical procedures. The prosecution did not seek to file *that* information under seal. The government violated children's privacy more than Dr. Haim ever allegedly did. And it used those patients to smear Dr. Haim by alleging that he intended to cause them malicious harm; the government has now dropped that allegation, too. Yet when it comes to its own attorneys, the government has gone so far as to violate the Constitution, common law rights to access, and federal rules to protect their doings and insulate them from criticism through unwarranted sealed filings and multiple orders seeking to muzzle the defense.

The prosecution's insistence on silence now has more self-serving purposes. Its slapdash positions contradict those taken by the Solicitor General and HHS and are inconsistent with DOJ policy. The more public scrutiny that this case attracts,

---

[10] The photograph depicts her presentation in *Texas v. Olivieri* in the 263rd District Court of Texas in 2012 and is available at https://www.gettyimages.com/detail/news-photo/prosecutor-tina-ansari-addresses-the-jurors-during-opening-news-photo/1576419714.

the more likely those other Executive Branch components will internally object and embarrass the attorneys who have signed onto these positions. Rather than making a measured and responsible decision on how to proceed in light of the many problems the prosecution has encountered, it has instead attempted to insulate itself from the consequences of its incompetence and misconduct. The prosecution continues to serve its own interests, not the public's.

### III.    There is nothing to the allegation regarding ethics rules.

Not content with pursuing Dr. Haim, the prosecution now also attacks his counsel through an accusation of a violation of Texas Disciplinary Rule of Professional Conduct 3.07.[11] Mot. at 1–2 & n.1. The foregoing proves this charge is meritless because there is no "substantial likelihood of materially prejudicing an adjudicatory proceeding." Moreover, Texas Rule 3.07(c)(2) provides a safe harbor for stating "information contained in a public record." Although the government's sealed filings preclude discussing the exact nature of the tweets (necessarily invalidating its criticism), to the extent they are like the one "suggest[ing] that []Ms. Ansari is making up law and statutes," then they are merely stating what was discussed in open court. Even a neutral description of the government's work should embarrass the prosecution and arouse the ire of any reasonable person. Because the

---

[11] It should not be lost on this Court that the despite the foregoing, the only explicit accusation of a violation of the ethics rules by defense counsel so far has been that Ms. Ansari was practicing law despite being administratively suspended by the Texas bar, Dkt. No. 49, which she effectively admitted, Dkt. No. 50.

tweets at least arguably fall within the safe harbor, there is little chance that a violation of Rule 3.07 could be found. *See Gentile*, 501 U.S. at 1049. And this provides no basis for a prophylactic gag order on further comment.

## CONCLUSION

The prosecution's motion for a gag order should be denied.

Dated: November 26, 2024

Respectfully submitted,

Marcella C. Burke
TX State Bar 24080734
SDTX No. 1692341
Burke Law Group, PLLC
1000 Main St., Suite 2300
Houston, TX 77002
Tel: 832.987.2214
Fax: 832.793.0045
marcella@burkegroup.law

Ryan Patrick
Attorney-in-Charge
TX State Bar 24049274
SDTX No. 3006419
Haynes and Boone LLP
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel: 713.547.2000
Fax: 713.547.2600
ryan.patrick@haynesboone.com

Jeffrey A. Hall
VA State Bar 82175
SDTX No. 3885025
Burke Law Group, PLLC
2001 L. Street N.W., Suite 500
Washington, D.C. 20036
Tel: 832.968.7564
Fax: 832.793.0045
jeff@burkegroup.law

Mark D. Lytle
DC Bar 1765392
SDTX No. 3884197
Nixon Peabody LLP
799 9th Street NW, Suite 500
Washington, D.C. 20001
Tel: 202.585.8435
Fax: 202.585.8080
mlytle@nixonpeabody.com

**ATTORNEYS FOR DEFENDANT EITHAN DAVID HAIM**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the above and foregoing document has been filed and served on November 26, 2024 using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Marcella C. Burke*
Marcella C. Burke