IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § § § |
| v. | § Criminal Action No: 4:24-cr-00298 § |
| EITHAN DAVID HAIM | § § |

**GOVERNMENT'S REPLY IN SUPPORT OF
ITS MOTION FOR A GAG ORDER**

TO THE HONORABLE DAVID HITTNER:

The Government respectfully submits this reply to the defendant Eithan David Haim's and proposed-intervenor X Corp.'s ("X") oppositions to the Government's motion for a gag order. (Dkt. Nos. 125, 127).

First, as set forth below, the Government is proposing a narrowly-tailored gag order that would permit the defendant to continue to make public statements about the case, but would prevent the defendant and his attorney from making inflammatory and unfairly prejudicial statements. Given the number of such statements readily available online, the defendant's national platform and increasing prominence, and his avowed intention to continue to make such statements, there is a substantial likelihood of prejudicing the Court's ability to conduct a fair trial.

Second, the Government opposes X's motion to intervene. X lacks standing

1

and has not demonstrated an injury in fact. The Court should deny X's motion to intervene.

I. BACKGROUND

The Government is prosecuting the defendant with felony violations of HIPAA for one reason, and one reason only: the evidence demonstrates that he committed those crimes.

At trial, the Government's proof will include, among other things, the testimony of witnesses, electronic evidence, including emails and data from Texas Children's Hospital's ("TCH") electronic medical records ("EMR") system, phone records, and the defendant's own statements. That evidence will show that in April and May 2023, the defendant obtained the individually identifying health information of children who were not under his care or treatment, and without authorization. He obtained the records through false pretenses: by pretending that he needed access to TCH's EMR for treatment of adult patients under his care. As his electronic footprint establishes, once he got access to the EMR, he never used it to obtain the records of his own patients. Instead, he used it to locate the records of pediatric patients receiving treatment for gender dysphoria. For example, the EMR records show that the defendant looked up the sexuality and gender identity of three of the four transplant patients listed in Count One. This was the culmination of a period of approximately

five months in which, as the defendant has stated publicly, he was trying to interest journalists in his story without success. Once he found the records he was looking for, he provided partially redacted records of pediatric patients to a media contact, with the intent to cause malicious harm to Texas Children's Hospital and its doctors. The media contact published the records, leaving unredacted the name of the treating doctor, the treatment, and the treatment date.

The Government is trying to uphold the law protecting patient privacy in the face of constant public rhetoric. In the media and in his opposition brief, the defendant has advanced a false narrative of government corruption, in which he acted as a whistleblower on a secret TCH program, and then the Government targeted him for political reasons, threatening him with felonies as retribution. The defendant's narrative ignores the facts and evidence, outlined above, and does not stand up to scrutiny.

Most of the defendant's ire is focused on the former lead prosecutor. Undersigned Government counsel joined the case after it was investigated and first indicted, and therefore cannot attest to whether the representations of pre-indictment conversations are accurate.[1] However, from defense counsel's descriptions, it appears the conversations comprised negotiations to resolve the matter pre-indictment, early

---

[1] As supporting evidence, the defendant cites to a letter written by his own counsel.

in the investigation. For example, the former lead prosecutor apparently suggested that if the defendant took personal responsibility and apologized for his violation of HIPAA, then the Government would consider offering him a misdemeanor plea. That is hardly misconduct. Rather, it shows leniency and compassion. And it completely undercuts the suggestion that the Government was going to charge him with a felony no matter what.

The rest of the defendant's motion contains inaccuracies and mischaracterizations, many of which he has stated repeatedly in his filings and public statements. For example, he suggests:

- Texas Children's Hospital was secretly continuing to perform pediatric transgender therapies despite claiming to have paused them, and the defendant's actions "exposed" the hospital. (Def. Opp. at 3). In fact, almost a year before the conduct in the Indictment, TCH publicly acknowledged that it had resumed these treatments. *See* "Houston pediatric chief's abrupt exit triggers fear, disappointment from trans community," Houston Chronicle (May 3, 2022), *available at* https://www.houstonchronicle.com/news/houston-texas/health/article/Pediatric-chief-s-abrupt-exit-from-hospital-17143159.php ("The hospital, [the TCH] spokesperson said, has continued to care for transgender patients in light of a recent statewide injunction by a Texas appeals court that blocks investigations triggered by the governor's order.").

- That the Government "confirmed" it indicted Haim because he had come forward as the source of the records. (Def. Opp. at 5). This statement is misleading: As the defendant is aware, the Government had conducted a months-long investigation before Haim publicly admitted he sourced the records, including gathering the evidence outlined above. His public statements were one piece of evidence—albeit a powerful one—that he had committed the crime.

- That HHS was unwilling to recommend prosecution due to legal

4

infirmities. (Def. Opp. at 5). The Government understands that HHS determined it lacked investigative jurisdiction to remain on the case because there was no Medicare/Medicaid loss.

- That "TCH told HHS that the defendant had 'approved and authorized access' to the medical records." (Def. Opp. at 5). This misquotes the TCH letter to HHS OCR, which said that the defendant had authorized access to the Electronic Medical Records system—not the medical records of the pediatric patients identified in Counts One through Four of the Second Superseding Indictment. *See* Dkt No. 85 (Ex. A at 8).

- That "[t]he government has all but admitted that it negligently sponsored false information to the grand jury." (Def. Opp. at 5). The Government conducted a fulsome investigation before the initial indictment. While preparing for trial, it learned new information, disclosed that information quickly, and sought a new indictment in line with those facts. Far from negligence or misconduct, the Government acted swiftly on new information in line with its ethical duties. And the new information did not undermine the core allegations, which were, and remain, the same.

- That the Government rushed to file its opposition to the defendant's motion to dismiss in three business days before the presidential election. (Def. Opp. at 6). In fact, the Government filed its opposition quickly in response to the Court's request that it do so.

- That the Government "effectively conceded that the [HIPAA] Privacy Rule . . . was defunct." (Def. Opp. at 6). The Government did not concede the Privacy Rule is defunct. It is the defendant's interpretation of HIPAA that guts the privacy protections for patients.

None of these allegations amount to prosecutorial misconduct. It is the defendant, and not the Government, who is bending the truth in service of his defense and in an attempt to color public opinion and unfairly taint the jury pool.

II. ARGUMENT

A. The Government's Proposed Gag Order Is Narrowly Drawn and Targets Inflammatory and Unfairly Prejudicial Speech

The Government is seeking a narrowly drawn, limited gag order on the defendant and his counsel. (*See* Proposed Gag Order, Dkt. 106). The gag order *would not* prevent the defendant from: (1) declaring his innocence; (2) summarizing the publicly available status of the case, the general nature of defenses, any public decision or order made by the Court, or the contents or substance of any motion in the proceedings (without elaboration or characterization); (3) expressing his opinions and commenting on the issue of transgender care for minors; (4) communicating with elected officials or other government officials about his case; or (5) asking for donations to his legal defense fund. In other words, the defendant would continue to be able to defend his reputation, petition the government, make public statements on an issue of public import, and raise funds for his defense.

He would not, however, be able do these things using the following kinds of unfairly prejudicial and inflammatory public statements that have a substantial likelihood of interfering with a fair trial or otherwise prejudicing the Government:

1. Using inflammatory characterizations and descriptors for members of the prosecution team and the case, for example:

    a. Saying that the Government's "loyalty to the cause to go after an innocent person is like their own blood sacrifice. If they can protect

6

      this evil ideology, if they can protect the harming of these children, then they are demonstrated to be loyal subservients;"[2]

   b. Describing the case as a "bungling, illicit, twitching pile of catastrophe" (Ex. B (Marcella Burke post));

   c. Describing the former lead prosecutor as a "child hiding something broken from her parent" (*id.*); and re-posting a statement describing her as a "slop-prosecutor" (along with posting a photo of her) (*id.*);

   d. Suggesting that "any other self-respecting career prosecutor would have folded up their tent and moved on quietly with some face-saving public comment by now" (Ex. A (Oct. 22 Haim post quoting Burke))[3];

   e. Suggesting that the prosecutors are "modern day woke aristocrat[s]" who "deploy the threat or the outright use of state-sanctioned violence against those who challenge their political ideology" engaging in "tyrannical behavior" (Ex. C. (Nov. 24 Haim post));

   f. Re-posting that the "prosecutorial team is a clown car of incompetent midwits" who "concocted fake crimes to try to imprison and make an example of a pediatric sex change whistleblower" (Ex. C (Nov. 26 Haim re-post)).

2. Suggesting that the Government is engaging in corrupt political targeting of the defendant, for example:

   a. Stating that the Government's "intent was to intimidate me" because the defendant had "threatened their ideology;"[4]

   b. That the case is "about silencing someone who stood up against the regime for what is right" (Ex. B (Burke post));

   c. That "[t]he case is pure retaliation poorly disguised as prosecution" (Ex. B (Burke post));

---

[2] The Dr. Jordan B. Peterson Podcast interview of Dr. Haim (video posted June 27, 2024, quote starting at minute 51:11, viewed 1,142,987 times as of Dec. 1, 2024) *available at* https://www.youtube.com/watch?v=lEwIAVSI7WI.

[3] Exhibit C, attached hereto, contains additional public X postings of the defendant.

[4] Haim, Eithan, "Not on My Watch," *City Journal* (Jan. 12, 2024), *available at* https://www.city-journal.org/article/a-whistleblower-on-gender-affirming-care-speaks-out.

d. That the Government "are doing this to send a message to anyone that thinks about whistleblowing on child-tranny operations" (Ex. B (Burke re-post));
e. That "[t]he remaining attorneys have picked up the torch of this radical, ideological prosecution" (Ex. C (Nov. 22 Haim post));
f. That "[the Government's] corrupt gambit relies on the silence of their target to legitimize their corruption" (Ex. C (Nov. 24 Haim post)).

3. Deploying inaccurate or misleading descriptions of what has happened in the case, for example:

   a. Stating that the first indictment was "exposed to be entirely based on fiction" (Ex. A (Nov. 20 Haim post)); and that the DOJ is "inventing criminal law to codify the prosecution of whistleblowers" (Ex. C (Nov. 20 Haim post)).

   b. Stating that the "[p]rosecutors try to manufacture a new crime by adding the word 'use' to the charges" and that the indictment was "riddled with nonexistent statutes alleging crimes that don't exist," (Ex. B (Burke post)); that the former lead attorney "is making up law and statutes in filings" (Ex. B (Burke re-post)); or that the Government had to "rescind their initial indictment after having to admit its allegations were complete false" (Ex. A (Oct. 22 Haim post quoting Burke)). As defense counsel is aware, the prior indictments had an unfortunate citation error regarding the subchapter of HIPAA, but that is a far cry from trying to invent statutes. Likewise, the "and/or use" was an inartful reference to the punishment provision's "intent to use" language, not an attempt to make up a crime;

   c. Saying that the government "fail[ed] to share evidence in a timely fashion" (Ex. B. (Burke post)). To the contrary, the Government quickly and timely shared all evidence as it was obtained. *See* Dkt. 43 at 2-3 (explaining sequence of events)).

These are just examples of the numerous public statements the defendant and his counsel have made over the course of the case. They paint the Government in the most

extreme terms as tyrannical, threatening, corrupt, and evil. And they are divorced from the facts. None of these statements would be allowed before a jury. *See* Dkt. 33, p. 19-20 (citing cases).

The defendant's opposition demonstrates why there is a substantial likelihood of prejudicing the jury unless a gag order is entered. As the defendant's opposition indicates, the case is garnering national media coverage. The defendant has appeared on prominent media outlets like Dr. Phil, Tucker Carlson, and Laura Ingraham, which reach millions of viewers nationally.[5] His online posts have been re-posted by others, and viewed hundreds of thousands of times. And he has made these kinds of statements throughout the case, and his opposition makes clear that he intends to continue to do so. In short, given the attention and the defendant's online presence, this is an exceptional case, and the concerns that motivated the district court in *Brown* are present here too. In contrast to the prior restraint at issue in *In re Goode*, 821 F.3d 554, 559-60 (5th Cir. 2016), cited by the defendant, the Government is not seeking a

---

[5] *See* "Dr. Phil: The Truth Behind Teen Transgender Clinic Exposed," (Apr. 11 2024) *available at* https://www.youtube.com/watch?v=L_UCcoqR3dg; "Uncensored: Eithan Haim," *available at* https://tuckercarlson.com/tucker-carlson-unsensored-eithan-haim; "This is a politically motivated investigation: Dr. Eithan Haim," (Jan. 14, 2024) *available at* https://www.foxnews.com/media/juvenile-trans-surgery-whistleblower-comes-forward-after-wiping-out-his-savings-to-rebuff-feds. Given the defendant's national platform, a change of venue would not alleviate the likelihood of prejudicing the jury.

9

complete bar to the defendant's speech. *See id.* (striking down a local rule that operated as a complete bar on any of the defendant's speech "relat[ed] to the trial or the parties or issues in the trial").

Finally, given the rhetoric involved and the impassioned debate surrounding pediatric transgender care, the Government is concerned about the safety of its prosecutors and agents when their photographs are circulating on the internet. This is not an abstract concern: after the defendant shared the medical records at issue with his media contact, one of the TCH doctors whose name and photo were publicly posted on X received threats and had to have security at her home. To be clear, the Government is not accusing the defendant or his counsel of intentionally trying to incite violence or threats; as far as undersigned counsel is aware, no member of the prosecution team has received threats. But the defendant has used extreme rhetoric, calling the prosecutors "evil" and saying they are protecting the harming of children. In this context, it is unprofessional for defense counsel to then re-post a photograph of one of the prosecutors—especially given the inaccurate statements in the post. Since Ms. Burke has since removed her entire X account, she presumably agrees. (Ex. D).

B. X Lacks Standing to Intervene

X, a third-party social media company, lacks standing to intervene in this case

because it has not demonstrated that it has suffered a concrete, particularized, actual or imminent injury in fact.

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action . . . ; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted). In the First Amendment context, "[a] litigant may assert the First Amendment rights of others if (1) the litigant has suffered an injury in fact to satisfy the Article III case or controversy requirement; and (2) the litigant has a close relation to the third party such that the litigant is an appropriate representative to effectively vindicate the third party's rights; and (3) there exists some practical obstacle to the third party's ability to protect his own interests." *In re Grand Jury Subpoena Issued to Twitter, Inc.*, 2017 WL 9287146, at *3 (N.D.T.X. Sept. 22, 2017) (citing cases).

X completely skips demonstrating that it—as opposed to the defendant—has suffered an injury in fact. X rests its arguments about standing on the Fifth Circuit's decision in *United States v. Aldawsari*, in which a third-party journalist sought to intervene to challenge a gag order that prevented all parties to a litigation from

communicating with the news media. 683 F.3d 660, 662 (5th Cir. 2012). However, unlike the third-party intervenor in *Aldawsari*, X is not a journalist or a news agency entitled to the special First Amendment protections afforded to the press. *See Davis v. East Baton Rouge Parish School Bd.*, 78 F.3d 920, 928 (5th Cir. 1996) (noting that "newsgathering is entitled to First Amendment protection"). Rather, X is a medium – more akin to the paper on which a newspaper is printed or the bricks in the proverbial town square. People use X to publish their statements.

    X has not articulated how a narrowly-drawn limitation on the speech of the defendant—one of millions of users of its platform—in the specific context of this case will cause it particularized harm. Journalists, commentators, and members of the public can continue—and no doubt, will continue—to use X to cover this case and a plethora of other topics. The Government is not seeking to curtail those activities. If the Court imposes the gag order, the defendant can continue to use X to speak about the case—just not in a way that could prejudice the administration of justice. And while X has its own First Amendment rights, it has cited no case law to explain how those rights are implicated by a limitation on the speech of another person, like the defendant. X, like its users, can freely comment on this case, and the Government's gag order is not preventing it from doing so.

    The Northern District of Texas case *In re Grand Jury Subpoena Issued to*

*Twitter, Inc.*, 2017 WL 9287146, is instructive. In that case, the district court found that X (Twitter, as it was known at the time) lacked Article III standing to challenge a subpoena the Government issued seeking the identifying information of certain of its users. *Id.* at *1-*2. The court explained, "the United States Court of Appeals for the Fifth Circuit has made clear that to establish third-party standing and assert the First Amendment rights of others, a party must first establish that it has Article III standing in its own right." *Id.* at *5 (citing *Serv. Emps. Int'l Union, Local 5 v. City of Houston (SEIU)*, 595 F.3d 588, 597 (5th Cir. 2010)). The court held that Twitter had failed to do so, and that "an interest in encouraging the free speech of others is not enough—Twitter must have a *personal stake* in [the remedy sought]." *Id.* at *5. "[A] chilling effect on Twitter's users does not constitute concrete and particularized injury that Twitter must suffer for Article III standing." *Id.*

X has failed to articulate "a case or controversy and affirmatively demonstrate the specific injury it will suffer." *Id.* It has not even articulated that the Government's gag order would have a chilling effect on X's users. Given the limited nature of the gag order sought, and the particular circumstances of this case, it cannot do so. Moreover, X has failed to explain why there is some practical obstacle to the defendant's ability to protect his own interests. *See Sec. of State of Md. V. Joseph V. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). To the contrary, the defendant has

13

mounted his own robust challenge to the Government's proposed gag order. X thus not only lacks an injury, but it lacks a purpose in this case. The Court should therefore deny its motion to intervene.

I. CONCLUSION

For the reasons set forth above, the Court should grant the Government's request for a gag order, and deny X Corp.'s motion to intervene.

Date: December 2, 2024

Respectfully submitted,

ALAMDAR HAMDANI
United States Attorney
Southern District of Texas

By:   *s/ Jessica Feinstein*
Jessica Feinstein
Tyler S. White
Assistant United States Attorneys
1000 Louisiana Street, 25th Floor
Houston, Texas 77002
Tel.: (713) 567-9000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this December 2, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all defense counsel of record.

<u>s/ Jessica Feinstein</u><br>
Jessica Feinstein<br>
Assistant United States Attorney